ATTORNEYS FOR APPELLANT
Joseph Cleary
Indianapolis, Indiana

Brent Westerfeld
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Stephen R. Creason
Deputy Attorney General
Indianapolis, Indiana

_____

## In the
## Indiana Supreme Court

_____

No. 49S00-0409-PD-420


BENJAMIN RITCHIE,

                                        *Appellant (Petitioner below),*

                            v.

STATE OF INDIANA,

                                        *Appellee (Respondent below).*

_____


Direct Appeal from the Marion Superior Court, Criminal Division, Room 4
No. 49G04-0010-CF-172900
The Honorable Patricia Gifford, Judge

_____


**November 8, 2007**


**Rucker, Justice.**

**Summary**

Benjamin Ritchie was convicted of murder, possession of a handgun by a serious violent felon, auto theft, and resisting law enforcement in connection with the 2000 shooting death of Beech Grove police officer William Toney. The trial court accepted the jury's recommendation for a sentence of death for the murder conviction and sentenced Ritchie to a total executed term of twenty years for the remaining convictions. On direct appeal, we affirmed Ritchie's conviction and sentence of death. Thereafter Ritchie filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. He now appeals that denial raising several issues for our review, some of which are waived.[1] We address the remaining issues, which we rephrase as follows: (1) whether Ritchie was denied the effective assistance of trial counsel; (2) whether Ritchie was denied the effective assistance of appellate counsel; and (3) whether he received a fair post-conviction hearing. We affirm the post-conviction court.

**Facts[2]**

A recitation of the essential facts in this case was set forth in our opinion on direct appeal as follows:

> On September 29, 2000, around 7:00 p.m, Ritchie and two others stole a white Chevrolet Astro van from a gas station in Beech Grove. The theft was reported and police were dispatched to the scene where Beech Grove police officer Matt Hickey filed a stolen

---

[1] Ritchie complains the mandatory procedures for capital sentencing and independent appellate review were violated. Br. of Appellant at 88. Under these general headings he alleges: (1) the trial court improperly instructed the jury that he was eligible for a sentence ranging between forty-five and seventy-five years, but the actual range was forty-five to ninety-four years; (2) the trial court erroneously gave the jury a special verdict form on the weighing element; and (3) the trial court failed to issue a written sentencing order. Id. at 88-92. The purpose of a petition for post-conviction relief is to raise issues unknown or unavailable to a defendant at the time of the original trial or appeal. Reed v. State, 856 N.E.2d 1189, 1194 (Ind. 2006). These issues were known and available at the time of Ritchie's direct appeal. An issue known but not raised on direct appeal is waived. Williams v. State, 808 N.E.2d 652, 659 (Ind. 2004).

[2] "Tr." refers to trial transcript. "P-Cr." refers to the transcript of the post-conviction proceedings.

vehicle report. Approximately two hours later, Hickey was en route to a traffic accident scene and recognized the stolen van as Ritchie and one of his accomplices drove by. After confirming by radio that the van bore the license plate of the stolen vehicle, Hickey pursued, joined by officers Robert Mercuri and William Toney. After a short chase, the van pulled into the yard of a residence where Ritchie and his companion jumped out and ran in opposite directions. Officer Toney pursued Ritchie on foot, and ultimately Ritchie turned and fired four shots, one of which struck Toney in the chest. Toney died at the scene.

Ritchie v. State, 809 N.E.2d 258, 261 (Ind. 2004), cert. denied, 546 U.S. 828 (2005).

## Procedural History

The State charged Ritchie with murder, unlawful possession of a firearm by a serious violent felon as a Class B felony, auto theft as a Class D felony, two counts of resisting law enforcement as Class D felonies, and carrying a handgun without a license, a Class C felony.[3] Tr. at 7. The State sought the death penalty based on two aggravating circumstances: (1) the victim of the murder was a law enforcement officer acting in the course of duty, Ind. Code § 35-50-2-9(b)(6)(A), and (2) at the time the murder was committed Ritchie was on probation after receiving a sentence for the commission of a felony. I.C. § 35-50-2-9(b)(9)(C).

Trial was held from July 31 through August 20, 2002. Prior to voir dire, Ritchie pleaded guilty to the serious violent felon in possession of a handgun charge. The jury convicted him on the remaining counts and recommended the death penalty for the murder conviction. The trial court accepted the jury's recommendation and sentenced Ritchie to death for the murder conviction. Tr. at 2909. As for the remaining counts, the trial court sentenced Ritchie as follows: (1) twenty years for the unlawful possession of a firearm as a serious violent felon, (2) three years for auto theft, (3) three years for resisting law enforcement, as a Class D felony, and

---

[3] On motion by the State the trial court dismissed the carrying a handgun without a license charge. App. at 52.

3

(4) one year for resisting law enforcement, as a Class A misdemeanor,[4] to be served concurrently. Id. at 2908-09.

On direct appeal, we affirmed Ritchie's convictions and death sentence. Thereafter, Ritchie filed a Petition for Post-Conviction Relief, which the post-conviction court granted in part[5] and denied in part after a hearing. This appeal followed. Additional facts are discussed below as necessary.

## Standard of Review for Post-Conviction Proceedings

The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); Fisher v. State, 810 N.E.2d 674, 679 (Ind. 2004). When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. Fisher, 810 N.E.2d at 679. To prevail from the denial of post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. Weatherford v. State, 619 N.E.2d 915, 917 (Ind. 1993). Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." Ben-Yisrayl v. State, 729 N.E.2d 102, 106 (Ind. 2000) (citation omitted).

## Standard of Review for Ineffective Assistance of Counsel

Most of Ritchie's claims fall under the general heading of the ineffective assistance of his trial and appellate lawyers. To establish a post-conviction claim alleging violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish the two

---

[4] The record before us does not reveal at what point or how one of the resisting law enforcement convictions was reduced from a Class D felony to a Class A misdemeanor.

[5] On Indiana double jeopardy grounds the post-conviction court vacated Ritchie's sentence for resisting law enforcement as a Class A misdemeanor. App. at 493-94.

components set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>Williams v. Taylor</u>, 529 U.S. 362, 390 (2000). First, a defendant must show that counsel's performance was deficient. <u>Strickland</u>, 466 U.S. at 687. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. <u>Id.</u> Second, a defendant must show that the deficient performance prejudiced the defense. <u>Id.</u> This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, meaning a trial whose result is reliable. <u>Id.</u> To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. <u>Id.</u> Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. <u>Ben-Yisrayl</u>, 729 N.E.2d at 106.

## Discussion

## I.

## Ineffective Assistance of Counsel – Guilt Phase

Ritchie raises two allegations of ineffective assistance during the guilt phase of trial: (A) "Failure to Retain Appropriate Expert Assistance" and (B) "Failure to Move for Suppression of Ritchie's Videotaped Statements." Br. of Appellant at 66, 71.

### A. *Expert Assistance*

The State's expert conducted a "laser trajectory analysis" to support the State's theory that Ritchie killed Officer Toney while lying in wait. At trial, Ritchie's defense team sought to undermine the State's "lying in wait" theory and advance the defense's theory that Ritchie acted recklessly in firing his handgun and did not knowingly or intentionally kill Officer Toney.[6] Br. of Appellant at 67. Consequently, rebutting the State's evidence on the operation of the handgun

---

[6] The record reveals that at Ritchie's request the trial court instructed the jury on reckless homicide and voluntary manslaughter as lesser-included offenses of murder. Tr. at 2120-21.

Ritchie used in the shooting – a Glock Model 26 – and the trajectory of the bullets became an important component of Ritchie's defense. Tr. at 1637-43. To assist at trial, defense counsel retained the services of Wayne Hill, who held himself out as a crime scene reconstructionist and ballistics expert.[7] Problems arose during a pre-trial deposition concerning Hill's asserted professional qualifications and articles he allegedly published. Hill's deposition testimony was also inconsistent with the report he had previously given to the defense. According to one of Ritchie's trial counsel, the prosecutor "absolutely destroyed this man's credibility as a witness and I might add fairly under the rules." P-Cr. at 170.

One of Ritchie's lawyers, Kevin McShane, concluded that he could not rely on Hill as a witness and that his testimony added no value to the defense. Id. at 171. Counsel did not consult with or retain another ballistics or reconstruction expert. Instead, the defense team decided the best strategy was to rely upon the testimony of the State's crime scene investigator, Mickey French. McShane knew French to be a "straight shooter" and a "real honest expert." Id. at 173. Counsel believed that favorable evidence to support their theory of the case could be elicited from French on direct as well as during cross-examination. French's testimony at trial did not exclude the defense theory of events.

Ritchie argues the failure to obtain another expert amounted to ineffective assistance of counsel. At the post-conviction hearing, Ritchie presented two experts: John Nixon and James Sobek. The post-conviction court found Nixon's and Sobek's testimony differed from that of French but not significantly so. App. at 454. For example, Nixon's testimony differed from French's regarding the relative safety of the handgun and a person's ability to accurately aim the gun at night. Id. Nixon offered anecdotal evidence that some Glock handguns similar to Ritchie's have accidentally discharged but acknowledged there is no reason to believe the gun in this case accidentally discharged four times. Because he had no personal knowledge, Nixon could not say whether Ritchie could accurately aim the handgun. Id. Sobek could only testify that the laser trajectory analysis conducted by the State's witness could not pinpoint the precise

---

[7] In his curriculum vitae Mr. Hill professed to be a expert in "homicide events reconstruction" with expertise in a variety of fields including: evidence collection, firearms, internal/external ballistics, forensic pathology, and the psychology of "high stress response." Pet'r P-Cr. Ex. 19 at 25-39.

trajectory that each bullet took, but he could not come up with a more precise trajectory location himself and acknowledged the analysis by the State's witness was largely correct. Id.

We agree with the post-conviction court's conclusion that the decision to rely upon testimony from the State's witness was reasonable under the prevailing professional norms. Rondon v. State, 711 N.E.2d 506, 520 (Ind. 1999) ("Trial counsel's strategy to put the State to its burden and not present a defense, like other strategic decisions, is a legitimate trial strategy.") (citation omitted). Additionally, Ritchie's experts do not challenge the accuracy of the State's expert testimony. It is at best wholly speculative that the expert testimony Ritchie provided at post-conviction would have affected the outcome of the trial. We will not second-guess counsel's strategic decision to put the State to its burden, especially without a showing of prejudice. Troutman v. State, 730 N.E.2d 149, 155 (Ind. 2000). In view of all these considerations, counsel's failure to procure another expert does not overcome the strong presumption of counsel's competence.

### B. Suppression of Ritchie's Videotaped Statements

Following his arrest, Ritchie was held in custody at the Marion County jail. After being advised of his Miranda rights, the police began to interrogate Ritchie but stopped when Ritchie told police he wanted a lawyer. P-Cr. at 639. Shortly thereafter, television station reporters contacted Marion County correctional officers and asked to interview Ritchie. According to several reporters, the officers advised them that Ritchie agreed to be interviewed. Before the interviews began Ritchie signed a form captioned as an "Interview Release" that provided in pertinent part:

> I, Benjamin Ritchie, do hereby voluntarily consent to give an interview to the news media. I understand that I have the right to have counsel present during this interview. I further understand that no threats, promises or agreements have been made by the Marion County Sheriff's Department for this interview and I further understand that the Marion County Sheriff's Department has no vested interest in granting said interview.

Resp't P-Cr. Ex. C, D, E & F. Ritchie did not request an attorney and none was provided. The interviews proceeded, and Ritchie talked to the media while shackled at the wrist and ankles and dressed in jail clothing. Marion County correctional officers were present throughout the interview. At trial, the State introduced three videotaped statements made during these news media interviews. Ritchie contends the videotapes were inadmissible due to a violation of his Miranda rights and because they violated his Fourteenth Amendment right not to be forced to appear in jail clothes or visibly shackled before the jury decided his fate. Ritchie complains counsel rendered ineffective assistance for failing to object or move to suppress these videotapes. Br. of Appellant at 76.

### (1)    _Miranda_ Violation

Ritchie contends that the interviews were part of a custodial interrogation, and police could not reinitiate questioning until counsel was provided. Id. at 73. Ritchie characterizes the interviews as "actions on the part of the police" because officers asked if he was willing to be interviewed, created the opportunity for the interviews to occur, and established the interview conditions. Id. He contends the officers should have known the reporters' questions were likely to elicit incriminating responses and that these interviews enabled law enforcement to do indirectly what Miranda prohibits, questioning him about the homicide without counsel. Id. at 73-74.

The Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during "custodial interrogation" without a prior warning. Illinois v. Perkins, 496 U.S. 292, 296 (1990). Police officers are not required to give Miranda warnings unless the defendant is both in custody and subject to interrogation. See Loving v. State, 647 N.E.2d 1123, 1125-26 (Ind. 1995). There is no question that Ritchie was "in custody" when he gave his statements.

The post-conviction court concluded that the videotapes did not run afoul of Miranda because these statements were "not given to the police as part of a custodial interrogation," rather they were voluntary statements to the media. App. at 451. We agree. Under Miranda,

8

"'interrogation' includes express questioning and words or actions *on the part of the police* that the police know are reasonably likely to elicit an incriminating response from the suspect." White v. State, 772 N.E.2d 408, 412 (Ind. 2002) (emphasis added) (citations omitted); see also Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (citation omitted). Though the officers allowed the opportunity for the interviews, the news reporters initiated and conducted the questioning, not police. Miranda warnings are required in order to overcome the inherently coercive and police-dominated atmosphere inherent to a custodial interrogation. Davies v. State, 730 N.E.2d 726, 733 (Ind. Ct. App. 2000). However, "[t]here is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." Perkins, 496 U.S. at 296-97. Thus, the essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes is not an officer. Id. at 296.

Additionally, civilians conducting their own investigation need not give Miranda warnings. Trinkle v. State, 259 Ind. 114, 284 N.E.2d 816, 818 (1972). In Luckett v. State, 158 Ind. App. 571, 303 N.E.2d 670, 671 (1973), civilians who were victims of a break-in conducting their own investigation questioned Luckett, whom they suspected was the culprit. He confessed to parts of the crime and later argued these statements were inadmissible because of a lack of a Miranda warning. The Court held there was no Miranda violation when "the victims of the break-in were acting on their own initiative as private citizens and were not under police control, were not agents of the police, and were not acting at the direction of police officers." Id. Ritchie, like Luckett, was in custody and questioned by private citizens acting on their own initiative. The reporters were not under police control, agents of the police, or acting at the direction of police officers. Ritchie presents no evidence to the contrary. Therefore, a Miranda warning was not constitutionally mandated in this situation.

Even if we were to assume the reporters' actions could be construed as police action, the evidence demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. Ritchie was advised of his right to counsel in writing before the interviews. App. at 451. Despite having not initiated the interviews, Ritchie voluntarily gave these

9

statements to the media. Ritchie does not contend he misunderstood the "Interview Release" form. Nor does he contend that the police coerced him into signing the form. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. Perkins, 496 U.S. at 297.

The post-conviction court correctly concluded the admission of the videotapes did not run afoul of Miranda. In order to prevail on a claim of ineffective assistance due to the failure to object, the defendant must show a reasonable probability that the objection would have been sustained if made. Wrinkles v. State, 749 N.E.2d 1179, 1192 (Ind. 2001). Finding no Miranda violation, we cannot say there is a reasonable probability that the objection would have been sustained if made. Nor is there a reasonable probability that a motion to suppress would have been granted on this ground. Accordingly, Ritchie has not met his burden of demonstrating that counsel's performance on this issue fell below an objective standard of reasonableness.

### *(2)    Appearance in Shackles*

Ritchie alleges the interview tapes were inadmissible because they depicted him dressed in jail clothing and shackled and that counsel rendered ineffective assistance by not objecting or moving to suppress these videotapes. Br. of Appellant at 75-76.

It is clearly established under both state and federal law that a criminal defendant cannot be forced to appear in either jail clothing or shackles during the guilt or penalty phase of trial without an individualized finding that the defendant presents a risk of escape, violence, or disruption of the trial. Deck v. Missouri, 544 U.S. 622, 624 (2005); Estelle v. Williams, 425 U.S. 501, 512 (1976); Illinois v. Allen, 397 U.S. 337, 344 (1970); Stephenson v. State, 864 N.E.2d 1022, 1032 (Ind. 2007). An accused should not be compelled to go before the jury dressed in jail clothes or shackled because: (1) the risk of diluting the presumption of innocence, (2) the risk that the jury might find guilt based on these extraneous influential factors rather than probative evidence subject to the rigors of cross-examination, and (3) the shackles could hinder the right to participate with counsel. See Deck, 544 U.S. at 630-31 ("Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process" and "[s]hackles can interfere with the accused's ability to communicate with his lawyer.") (citation

10

omitted); Estelle, 425 U.S. at 504 (discussing the potential for jail clothing to dilute the presumption of innocence and the principle that guilt is to be established by probative evidence and beyond a reasonable doubt). Applying these rationales, Ritchie contends these videotapes were constitutionally inadmissible and prejudicial. Br. of Appellant at 76.

However, Deck and its predecessors only discuss the use of jail clothing and visible shackles during *courtroom proceedings*. Ritchie was not forced to appear before the jury in jail clothing and shackles. Rather his claim is one step removed in that the jury viewed a videotape of Ritchie appearing in jail clothing and shackles while in police custody. The concerns with having a criminal defendant appear in jail clothing or shackles in a courtroom proceeding are not directly applicable to Ritchie's situation. Certainly, his right to participate with counsel is not implicated. Additionally, it appears to this Court that the risk of diluting the presumption of innocence or guilt being established by an extraneous influential factor is minuscule. Ritchie presents no evidence of how viewing him in jail clothing and shackles on the videotape had a bearing on his verdict. Any reasonable juror would have expected Ritchie to be dressed in jail clothing and shackled when meeting with members of the public outside the security of a jail cell. See generally Davis v. State, 770 N.E.2d 319, 326 (Ind. 2002) (stating potential jurors would reasonably expect that anyone in police custody would be restrained).

We agree with the post-conviction court that this is not a case of the petitioner appearing before the jury wearing jail garb and shackles. App. at 452. Thus, it is clear that an objection, had one been made, would not have been sustained and counsel's actions did not fall below the objective reasonable standard of care. But even assuming for the sake of argument counsel's failure to object or move to suppress the videotapes fell below an objective standard of reasonableness, Ritchie still has failed to show that, but for counsel's error, the outcome of the trial would have been different. That is to say, Ritchie has failed to show that, but for the videotapes, the jury would have returned a verdict recommending a sentence of a term of years rather than a death sentence. See Fountain v. United States, 211 F.3d 429, 436 (7th Cir. 2000) (finding petitioner failed to establish prejudice because an objection to the shackling would not have likely altered the result); see also Davis, 770 N.E.2d at 326 (finding, absent actual harm as a result of the jury seeing him momentarily in handcuffs, the trial court would not have abused its

11

discretion in denying a motion for mistrial made by counsel at trial). We agree counsel was not ineffective.

## II.

### Ineffective Assistance of Counsel – Penalty Phase

Ritchie next complains that counsel rendered ineffective assistance for failing to do a better job in presenting evidence of mitigation. Br. of Appellant at 34. More specifically, Ritchie alleges counsel failed to: (A) investigate and present educational evidence; (B) investigate and prepare a social history report; and (C) obtain and present appropriate psychological experts.

This Court acknowledges the importance of presenting mitigating evidence, particularly in capital cases. Harrison v. State, 707 N.E.2d 767, 783 (Ind. 1999). We have previously held that the failure to investigate and present mitigating evidence could constitute ineffective assistance of counsel, warranting the vacation of a death sentence. Id. (citing Burris v. State, 558 N.E.2d 1067, 1076 (Ind. 1990); Smith v. State, 547 N.E.2d 817, 822 (Ind. 1989)); see also Prowell v. State, 741 N.E.2d 704, 714 (Ind. 2001). That is not to say that counsel is required to present all available mitigation evidence. Counsel may make strategic judgments not to present certain types of mitigating evidence. Timberlake v. State, 690 N.E.2d 243, 261 (Ind. 1997) ("As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase."). However, the strategic choice not to present mitigating evidence made after less than complete investigation may give rise to an ineffective assistance of counsel claim for failure to investigate. We digress to elaborate upon this duty to investigate mitigating evidence.

With the benefit of hindsight, a defendant can always point to some rock left unturned to argue counsel should have investigated further. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that it deprived the defendant of a fair trial. Strickland, 466 U.S. at 686. Strickland does not require counsel to investigate every conceivable line of mitigating evidence

12

no matter how unlikely the effort would be to assist the defendant at sentencing. Wiggins v. Smith, 539 U.S. 510, 533 (2003). This would interfere with the constitutionally protected independence of counsel at the heart of Strickland. Id. Rather, we review a particular decision not to investigate by looking at whether counsel's action was reasonable in light of all the circumstances. Id. at 521-22. In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that the particular investigation is unnecessary. Id. at 521. A strategic choice not to present mitigating evidence made after thorough investigation of law and relevant facts is virtually unchallengeable, but a strategic choice made after less than complete investigation is challengeable to the extent that reasonable professional judgment did not support the limitations on the investigation. Id. Thus, the Court's principal concern is not whether counsel should have presented more in mitigation but whether the investigation supporting their decision not to introduce mitigating evidence was itself reasonable. Id. at 523.

## A.     *Educational Evidence*

Counsel assembled a defense team that included Cheri Guevara, a mitigation specialist, Larry Atwell, an investigator and former police officer, and Dr. Michael Gelbort, a neuropsychologist. App. at 432. Counsel obtained school, adoption and hospital records and interviewed several family members and persons familiar with Ritchie's background and upbringing. Id. Ritchie argues counsel focused only on his early childhood years, stating "almost nothing [was] presented regarding [Ritchie's] life after being adopted by the Ritchies."[8] Br. of Appellant at 33. Ritchie contends teachers and school personnel should have been contacted in an effort to discover all reasonably available mitigating evidence and counsel's failure to do so resulted in ineffective assistance. Id. at 34.

Although the focus of the defense was on Ritchie's early childhood, counsel did in fact present evidence of his later years. Both Verna and Oscar Ritchie testified about Ritchie's

---

[8] Ritchie's mother, Marion Martin, divorced Donald Peoples while Ritchie was still an infant. Peoples took custody of Ritchie's two older half-brothers but left Ritchie with Martin upon learning he was not Ritchie's father. At the age of eight, Verna and Oscar Ritchie adopted Ritchie at which time his birth name of Peoples was discontinued.

13

continuing troubles throughout school and their attempts at responding to those issues. They recounted how they ensured Ritchie attended school, Tr. at 2721, 2751, attended numerous parent-teacher conferences and counseling to address ongoing behavioral problems, id. at 2722-23, 2752, placed him in special classes to address his needs, id. at 2723-24, sought counseling from their minister around the third and fourth grade, id. at 2727, and took him for treatment at Community North Hospital at age ten. Id. at 2732. They both discussed his experience as a teenager going to live with his mom, who after only four weeks kicked him out because she could not handle him. Id. at 2727, 2756. Dr. Gelbort corroborated their testimony by recounting Ritchie's difficulties in school documented in his school records, including repeating the first grade and dropping out in the ninth grade. Id. at 2446, 2490-91. Dr. Gelbort testified to Ritchie's learning disability and diagnosis of Attention Deficit Disorder (ADD) at age eight and the various treatments tried, including taking Ritalin in elementary school and his placement in Community North at age ten. Id. at 2490-92. Dr. Gelbort explained the severely emotionally handicapped classes Ritchie attended. Id. at 2447. Additionally, Dr. Gelbort recounted head injuries Ritchie received from a motorcycle accident at age fourteen and being hit in the head with a baseball bat at age sixteen. Id. at 2442.

The post-conviction court found that Ritchie's counsel made a thorough, in-depth presentation to the jury during the penalty phase of trial concerning the facts and circumstances of Ritchie's unfortunate childhood. App. at 433. Counsel tied Ritchie's earlier childhood experiences before the age of two to the behavioral problems he experienced throughout grade school and into high school. We agree with the post-conviction court. The record clearly shows that counsel's investigation included Ritchie's medical, educational, family, and social history. "The investigation and presentation of mitigating evidence by trial counsel was substantial and the fact that post-conviction lawyers have managed to find some that may be non-cumulative does not lead to a conclusion different from that of the post-conviction court . . . ." State v. McManus, 868 N.E.2d 778, 791 (Ind. 2007). Further, the post-conviction court found that there was not a reasonable probability of the jury recommending a sentence other than death even had counsel presented the additional testimony of his struggles in school and impressions and observations of his educators. App. at 442. We agree and conclude counsel was not ineffective.

14

*B.*     *Social History Report*

As we indicated above, counsel obtained Ritchie's school, adoption, and hospital records and interviewed family members and persons familiar with Ritchie's background. However, counsel did not direct the mitigation specialist to prepare a social history report summarizing this information. Ritchie claims failure to do so constitutes ineffective assistance. Br. of Appellant at 42.

At the post-conviction hearing Ritchie offered a written social history report as an exhibit. Upon reviewing the report, the post-conviction court found that it reveals nothing that would have significantly altered counsel's presentation of Ritchie's family background and upbringing at trial. App. at 443. The Summary of Findings from the offered social history report provides:

> The social history investigation reveals that Benjamin Ritchie's nuclear and extended family is steeped in dysfunction. Ben was raised in a family system characterized by neglect, abuse, sexual promiscuity, infidelity, and mental illness. There is also a multigenerational history of alcohol abuse and addiction, violence, the rejection and abandonment of children, and various forms of criminal and antisocial behavior.

Pet'r P-Cr. Ex. 20 at 3.

We first observe that because of the hearsay statements contained throughout the report, it is not altogether clear whether the report itself would have been admissible at trial over a timely objection.[9] In any event, Ritchie's counsel presented the same information at trial, by way of live testimony, as that provided for in the social history report offered at the post-

---

[9] An investigative report may be admissible if it meets the requirements of Indiana Evidence Rule 803(8). Joyner v. State, 736 N.E.2d 232, 243 (Ind. 2000). The United States Supreme Court recently discussed this issue in Wiggins, 539 U.S. 510. The majority found the social history report "may have been admissible under Maryland law," recognizing a relaxed standard to allow for the consideration of any aspect of the defendant's character the defendant would offer as a basis for a sentence less than death. Id. at 536-37. The dissent took issue with this statement. Wiggins, 539 U.S. at 555-56 (Scalia, J., dissenting) (finding the statements within the social history report are hearsay, "were of especially dubious reliability," and would be inadmissible in a court of law).

15

conviction hearing. Ritchie's mother testified about her use of drugs while pregnant with Ritchie and during his childhood, which was confirmed by other witnesses. Tr. at 2283. Tony Wheeler, his mother's paramour, described the sexual promiscuity, drug, and alcohol use occurring in Martin's household. Id. at 2322-27. Donald Peoples testified that this led to the deterioration of their marriage. Peoples stated he took custody of the other two boys, leaving Ritchie behind once Martin disclosed Ritchie was not in fact his son. Id. at 2350, 2355-56. Issues of abandonment were also introduced through Martin's account of leaving Ritchie at the age of two to meet a man in Florida. Id. at 2296. Martin detailed how Ritchie was shuttled to Brenda and Larry Cotton, only to be retrieved by her because of allegations of child abuse. Id. at 2307-08. Shortly thereafter, Martin gave Ritchie to Verna and Oscar because the man she was living with at the time did not want him. Id. at 2309. Lillie Clifton described how twelve-year-old Ritchie felt he had no family and could not understand why Peoples or his mother did not want him. Id. at 2407. The evidence of Ritchie's dysfunctional family life was corroborated by several other family members, including Ritchie's uncle, id. at 2650-51 (recounting the abandonment by Martin when she would fail to show for visits); id. at 2652 (describing Martin's drug use); Ritchie's half-brother, id. at 2678 (recounting the drug use and promiscuity of Martin in front of him at ages five and six); Oscar Ritchie, id. at 2712, 2714-15 (confirming Martin's drug use during pregnancy and abandonment of Ritchie); and Verna Ritchie, id. at 2739 (describing Martin's appearance as "loaded" while pregnant). As discussed previously, his continuing troubles and mental difficulties throughout school were presented through testimony from Verna and Oscar Ritchie and Dr. Gelbort. Id. at 2447, 2491, 2724, 2732.

The evidence presented painted the exact same picture as that described in the offered social history report. We agree with the post-conviction court that the failure to direct the preparation of a written social history report did not constitute deficient performance.

### C.    *Failure to Obtain and Present Appropriate Psychological Experts*

Ritchie's claims regarding the use of psychological experts are two-fold. First, he claims counsel was ineffective for failing to procure the testimony of Dr. Pearce, who was Ritchie's psychiatrist at Community North Hospital during and following an in-patient admission.

Second, he claims counsel was ineffective for not obtaining other psychological experts in addition to Dr. Gelbort, a neuropsychologist. Br. of Appellant at 46, 50. We address each in turn.

### (1) Interview and Presentation of Dr. Pearce

Dr. Pearce was Ritchie's attending psychiatrist when Ritchie, in 1991 at age ten, was admitted as an in-patient to Community North Hospital, a psychiatric facility. Dr. Pearce continued to follow up periodically on Ritchie's condition after his release and through 1994. In preparation for trial, counsel did not interview Dr. Pearce. P-Cr. at 184. At the post-conviction hearing, Dr. Pearce testified about the hospitalization at Community North Hospital. He testified Ritchie's attempted suicide was an indicator of a serious mental health problem with depression. Id. at 428. Additionally, he stated Ritchie was doing fairly well by late 1992. Id. at 433.

The record shows, however, that evidence of Ritchie's hospitalization at Community North Hospital was admitted at trial. Dr. Gelbort detailed Ritchie's troubles as a child and specifically testified before the jury about Ritchie's psychiatric intervention at Community North Hospital. Tr. at 2495-96. Adding cumulative evidence to Dr. Gelbort's testimony would not lead to a reasonable probability that the jury would have recommended a sentence other than death. See Harrison, 707 N.E.2d at 784 (affirming the post-conviction court's finding that the mitigating evidence offered at the post-conviction hearing was cumulative and counsel was not ineffective). We conclude that Ritchie has failed to show the outcome of his trial would have been different had this additional testimony been presented. Thus, counsel was not ineffective.

### (2) Presentation of Additional Psychological Experts

Dr. Gelbort reviewed Ritchie's medical history and conducted a comprehensive neuropsychological examination. He concluded that Ritchie suffered from a cognitive disorder not otherwise specified. Tr. at 2498. Dr. Gelbort noted that the possible causes of Ritchie's cognitive disorder included: his mother's ingestion of drugs and alcohol during pregnancy, possible genetic predisposition, and possible head injuries. Id. at 2500-01. Counsel did not

17

present any additional psychological experts for the penalty phase of trial. P-Cr. at 192. Ritchie claims that having competent psychological assistance would have shown that Ritchie suffered from a bipolar disorder. Br. of Appellant at 22.

At the post-conviction hearing, Ritchie presented Dr. Robert Kaplan, a forensic psychologist, who testified Ritchie suffered from an unspecified bipolar disorder. P-Cr. at 543. Dr. Kaplan relied upon essentially the same facts and observations relied upon by Dr. Gelbort. The post-conviction court found that when asked to identify the pertinent physiological brain defect that was the cause of Ritchie's afflictions, Dr. Kaplan was unable to specifically identify the cause but only speculated genetic factors or early childhood abuse, neglect, substance abuse, or abandonment could be to blame. App. at 439.

Dr. Kaplan offered the kind of expert testimony that in most circumstances can be generated when an investigation is done in hindsight. Pointing to the fact that two doctors disagree does not show counsel conducted an unconstitutionally inadequate investigation. See Conner v. State, 711 N.E. 1238, 1256 (Ind. 1999) (noting "psychiatrists disagree widely and frequently on what constitutes mental illness [and] on the appropriate diagnosis to be attached to given behavior and symptoms") (citation omitted). The ability of post-conviction counsel to locate and present expert opinion disagreeing with the psychiatric evidence at trial does not lead necessarily to the conclusion of counsel's ineffectiveness. Id. We agree with the post-conviction court that counsel was not ineffective in failing to further investigate Ritchie's mental capacities for mitigation purposes or in preparing and presenting that evidence to the jury.

## III.

### Ineffective Assistance of Appellate Counsel

The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel in that the petitioner must show appellate counsel was deficient in performance and that the deficiency resulted in prejudice. Bieghler v. State, 690 N.E.2d 188, 192 (Ind. 1997). When raised on collateral review, ineffective assistance claims generally fall

18

into three basic categories: (1) denial of access to an appeal, (2) waiver of issues, and (3) failure to present issues well. Id. at 193-95.

Both of Ritchie's claims of ineffective assistance of appellate counsel fall under the second category. Ineffectiveness is very rarely found in these cases because "the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." Id. at 193 (citation omitted). Accordingly, our review is particularly deferential to counsel's strategic decision to exclude certain issues in favor of others. Id. at 194. We first look to see whether the unraised issues were significant and obvious upon the face of the record. Id. If so, then we compare these unraised obvious issues to those raised by appellate counsel, finding deficient performance "only when ignored issues are clearly stronger than those presented." Id. (citations omitted). If deficient performance by counsel is found, then we turn to the prejudice prong to determine whether the issues appellate counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial. Id.

Specifically, Ritchie claims appellate counsel failed to raise: (A) the inappropriateness of Ritchie's death sentence and (B) the constitutionality of the exclusion of a juror.

A.      Inappropriateness of Ritchie's Death Sentence

Article VII, Section 4 of the Indiana Constitution provides that "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to . . . review and revise the sentence imposed." Our rules authorize a revision of a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). On direct appeal, appellate counsel did not raise a 7(B) challenge to the appropriateness of Ritchie's sentence. Ritchie contends that counsel's failure to do so amounts to ineffective assistance.

Before the 2002 amendments to Indiana's Death Penalty Statute,[10] this Court as a matter of course reviewed and revised sentences in capital cases without the need of counsel raising this claim as a discrete issue. See, e.g., Minnick v. State, 698 N.E.2d 745, 760 (Ind. 1998) ("As part of our death penalty review, we will independently consider the jury recommendation against death and determine whether the death penalty is appropriate.") (citation omitted); see also Timberlake, 690 N.E.2d at 266 ("Each death penalty case receives individualized appellate scrutiny to ensure that the death penalty is appropriate."); Thompson v. State, 492 N.E.2d 264, 268 (Ind. 1986) ("[T]he State Supreme Court must review every capital sentence to ensure that the penalty has not been imposed arbitrarily or capriciously."). It is true that on direct appeal in this case the Court did not engage in an independent evaluation concerning the appropriateness of Ritchie's sentence. However, counsel cannot be criticized for failing to raise an issue that this Court routinely addressed on its own initiative.[11]

In any event, even assuming for the sake of argument appellate counsel's failure to raise a 7(B) challenge fell below an objective standard of reasonableness, Ritchie has not demonstrated a reasonable probability that this issue would have resulted in this Court revising his death sentence. The nature of the offense is that the victim of the murder was a law enforcement officer acting in the line of duty. This Court has determined that shooting and killing an officer acting in the line of duty is "certainly among the most severe circumstances warranting the death penalty." Pruitt v. State, 834 N.E.2d 90, 121 (Ind. 2005). As for his character, Ritchie argues that he is "neither the very worst offender nor has he committed the worst offense" to warrant the sentence of death. Br. of Appellant at 80. This Court has observed, "[T]he maximum possible

_____

[10] At the time of Ritchie's crime, Indiana Code section 35-50-2-9(e) (1998) provided in pertinent part, "The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation."

[11] The 2002 amendments to Indiana's sentencing statutes provided in pertinent part, "If the jury reaches a sentencing recommendation [of either the death penalty or life imprisonment without parole], the court shall sentence the defendant accordingly." I.C. § 35-50-2-9(e). There has been no consensus on this Court concerning whether our review and revise authority survives the 2002 amendments. See Pruitt, 834 N.E.2d at 122 (Shepard, C.J., concurring in result) (questioning the continued use of the appropriateness review under the new sentencing scheme where the legislature has placed the question of appropriateness in the hands of juries); see also Baer v. State, 866 N.E.2d 752, 766-67 (Ind. 2007) (Shepard, C.J., concurring) (same).

sentences are generally most appropriate for the worst offenders." Buchanan v. State, 767 N.E.2d 967, 973 (Ind. 2002) (citations omitted). But we have clarified: "This is not, however, a guideline to determine whether a worse offender could be imagined. Despite the nature of any particular offense and offender, it will always be possible to identify or hypothesize a significantly more despicable scenario. Although maximum sentences are ordinarily appropriate for the worst offenders, we refer generally to the *class* of offenses and offenders that warrant the maximum punishment. But such class encompasses a considerable variety of offenses and offenders." Id.

Ritchie's character includes an unfortunate childhood and mental health issues. It is of course true that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Childhood abuse and privation may, along with other mitigators, "influence[] the jury's appraisal of . . . moral culpability." Williams, 529 U.S. at 398. However, this Court has consistently held that evidence of a difficult childhood warrants little, if any, mitigating weight. See Coleman v. State, 741 N.E.2d 697, 703 (Ind. 2000) (rejecting the claim that evidence of childhood abuse and neglect if presented to the sentencing court would have resulted in a sentence other than death); Peterson v. State, 674 N.E.2d 528, 543 (Ind. 1996) (mitigating weight warranted by a difficult childhood is in the low range); Loveless v. State, 642 N.E.2d 974, 977 (Ind. 1994) (showing such evidence is occasionally declared not mitigating at all).

Ritchie cites Spranger v. State, 650 N.E.2d 1117 (Ind. 1995), to support his argument for a revision of his sentence. In that case this Court affirmed the post-conviction court's decision to set aside Spranger's death sentence based on the (b)(6)(A) aggravating factor, the victim of the murder was a law enforcement officer acting in the course of duty. The post-conviction court determined that Spranger was a "young man of limited mental ability with no history of violence or criminal conduct." Id. at 1125. These facts in Spranger are readily distinguishable. Here the record shows that Ritchie has an extensive juvenile history – involving three battery charges –

21

that continued into adulthood. As the trial court observed, Ritchie's history of juvenile offenses demonstrated a "pattern of violent crimes finally escalating into murder." Tr. at 2908. As mentioned earlier in this opinion, at the post-conviction hearing Dr. Kaplan testified that Ritchie suffered from a bipolar disorder. P-Cr. at 543. However, the post-conviction court found that Ritchie had sufficient mental capacity to make appropriate decisions but did not make a great effort to control his anger and continued to engage in destructive behaviors despite long-sustained efforts by those around him. App. at 466-67. The post-conviction court concluded that there was no evidence that Ritchie's mental illness negated his conscious choice to fatally shoot Officer Toney. Id. at 467. In sum, we conclude there is nothing about Ritchie's character or the nature of the offense Ritchie committed that would justify revising his capital sentence. Having reached this conclusion, we reach its obvious corollary that Ritchie has failed to show that the outcome of his direct appeal would have been any different had appellate counsel raised a 7(B) challenge to his sentence.

### B. *Exclusion of a Prospective Juror*

During voir dire, the State challenged eight prospective jurors for cause based on their beliefs about the death penalty. Ritchie points to one in particular, prospective Juror McClimon ("McClimon"). Ritchie argues the colloquy with McClimon did not establish that her views about the death penalty substantially impaired her ability to follow her oath as a juror, and her exclusion should have been challenged on direct appeal. Br. of Appellant at 82.[12]

The United States Supreme Court has established certain principles regarding the exclusion of jurors based upon their beliefs about the death penalty. First, a criminal defendant has the right to an impartial jury not tilted in favor of capital punishment by selective prosecutorial challenges for cause. Uttecht v. Brown, 127 S.Ct. 2218, 2224 (2007) (citing

---

[12] The post-conviction court determined that trial counsel did not object to the removal of McClimon and thus appellate counsel would have had to raise this issue as a fundamental error. App. at 465. The post-conviction court concluded Ritchie did not show the dismissal constituted a fundamental error and therefore failed to show appellate counsel was deficient in not raising the issue or that he was prejudiced by the failure to do so. Id. The record does not support the post-conviction court's findings. The record shows that counsel objected to the removal of McClimon, citing to both federal and state authority. Tr. at 684. The trial court overruled the objection stating, "The Court is of the opinion that the prospective juror does meet the standard of the Indiana code and of [Wainwright v.] Witt . . . ." Id. at 687.

22

Witherspoon v. Illinois, 391 U.S. 510, 521 (1968)); see also Bieghler v. State, 481 N.E.2d 78, 87 (Ind. 1985)) (The mere disagreement with the death penalty, conscientious scruples, or even feelings that one would find it almost impossible to vote for death are not sufficient to exclude a juror for cause.).  Second, the State has a strong interest in having jurors able to apply the death penalty within the State's capital punishment framework.  Uttecht, 127 S.Ct. at 2224 (citing Wainwright v. Witt, 469 U.S. 412, 416 (1985)).  To balance these interests, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Witt, 469 U.S. at 420 (citation omitted) (emphasis omitted).  If a prospective juror is barred from jury service based on his or her views about capital punishment on any broader basis than inability to follow the law or abide by his or her oaths, the United States Supreme Court has established a *per se* rule requiring the vacation of a death sentence imposed by a jury from which a potential juror had been erroneously excluded for cause.  Gray v. Mississippi, 481 U.S. 648, 659-60 (1987) (discussing the continued application of the *per se* rule established in Davis v. Georgia, 429 U.S. 122 (1976)).

In determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's rights, the trial court is required to make a finding as to substantial impairment based in part on the demeanor of the juror.  Uttecht, 127 S.Ct. at 2224 (citing Witt, 469 U.S. at 424-34); Daniels v. State, 453 N.E.2d 160, 166 (Ind. 1983) (When the juror's answers are equivocal it is the duty of the trial court to pursue the matter further until it is established whether the juror is "irrevocably committed" to vote against the death penalty.).  Once a trial court has made a finding of substantial impairment deference is owed to the trial court, and its finding is reviewed for an abuse of discretion.  Uttecht, 127 S.Ct. at 2228.

Here the trial court supervised a diligent and thoughtful voir dire and engaged in a lengthy discussion with McClimon.  After indicating her feeling of not believing in the death penalty, the following colloquy took place between the trial court and McClimon:

> COURT:  You would be required to weigh the mitigating and the aggravating circumstances, and then to make a recommendation of either the death penalty, life without parole, or a term of years.

23

Now, if those were your options, do you feel that you would be able to consider with an open mind whether or not the death penalty should be recommended?

PROSPECTIVE JUROR McCLIMON: Yeah, I guess so.

COURT: Do you think that you might be able to recommend the death penalty?

PROSPECTIVE JUROR McCLIMON: It's possible. I mean I guess I just have to hear the case.

COURT: Okay. That's certainly a fair answer. It is important, so you're not precluding the fact that you might not ever be able to recommend it?

PROSPECTIVE JUROR McCLIMON: Right, I guess, yeah.

Tr. at 679-80. However, when the prosecutor asked her if her beliefs would interfere with her ability to follow her oath as a juror and fairly consider recommending the death penalty, McClimon answered, "Yeah, I think it will." Id. at 680. The prosecutor asked the same question again, and she replied, "Yeah, it might. I just don't know. I've never been put in a situation like this. And before I've always felt that, like I said, that I just don't – I'm not for the death penalty. In some situations yeah, I guess so, but I don't know." Id. at 681. The prosecutor also asked whether she could honestly see herself recommending the death penalty if Ritchie was found guilty of murdering a police officer. McClimon answered, "I don't think so. I don't really think I could." Id.

The trial court upon hearing McClimon's conflicting and equivocal answers concluded that she could not fulfill her duties and sworn oath as a juror. Id. at 687. A potential juror's bias cannot always be deduced in a question-and-answer session, and "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear.'" Uttecht, 127 S.Ct. at 2223 (quoting Witt, 469 U.S. at 424-25). Despite a lack of clarity in the record, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Witt, 469 U.S. at 425-26. When the prospective juror gives ambiguous, equivocal, or conflicting statements, assessing the demeanor of the venire is a critical factor in evaluating the attitude and qualification of potential jurors. Uttecht, 127 S.Ct. at 2224. Thus, the deference given to the trial court encompasses its resolution of any equivocations and conflicts in the prospective jurors' responses on voir dire. Witt, 469 U.S. at 426.

24

Considering the voir dire as a whole and giving the requisite deference to the trial court's findings, we cannot say there is a reasonable probability upon appeal that this Court would have found the trial court abused its discretion in finding McClimon's views against the death penalty substantially impaired her ability to follow her oath. Thus, we cannot say this issue was clearly stronger than those presented on direct appeal. On this issue, counsel's performance was not deficient.

## IV.
### Denial of a Full and Fair Post-Conviction Hearing

Ritchie contends that he was denied a full and fair post-conviction hearing. This contention is based on the following facts. At the hearing, Ritchie called as an expert witness a lawyer with extensive experience in capital litigation. The witness provided lengthy testimony concerning what is expected of counsel in the preparation and trial of a capital case, the prevailing professional norms for a capital defense attorney, and, on a wide variety of issues, what he would have done differently than Ritchie's lawyers. P-Cr. at 640-76. However, on at least three occasions during the witness' testimony, Ritchie asked – sometimes worded slightly differently – whether the witness had "an opinion regarding the reasonableness" of trial and appellate counsel's conduct. Id. at 655, 664, 671. Sustaining the State's objection, the post-conviction court would not permit the witness to give testimony on such an opinion. Ritchie made an offer of proof, which essentially recounted many of the allegations raised in this appeal which Ritchie contends amount to ineffective assistance. According to Ritchie, the witness would have testified that the conduct of Ritchie's trial and appellate counsel "fell below prevailing professional norms and was unreasonable under the standards of the conduct of counsel in capital defense cases in Indiana and nationally." Id. at 684.

The decision to admit or exclude expert testimony is entrusted to the sound discretion of the trial court, and we will reverse only for abuse of that discretion. Williams v. State, 706 N.E.2d 149, 163 (Ind. 1999). Although expert witnesses may testify concerning their opinions generally, see Ind. Evidence Rule 702, experts may not testify "to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has

25

testified truthfully; or *legal conclusions*." Evid. R. 704(b) (emphasis added); <u>see also</u> <u>Carter v. State</u>, 754 N.E.2d 877, 881-82 (Ind. 2001). And this is so because: (1) legal conclusions are not helpful to the trier of fact, (2) legal conclusions are reserved solely for the court's determination, and (3) it is the function of the court, not the expert witness, to instruct on the law. <u>See generally</u> 13 Robert Lowell Miller, Jr., <u>Indiana Practice, Indiana Evidence</u> § 704.206, 460 (2d ed. 1995).

Apparently contending that an opinion about the reasonableness of counsel's conduct is not a legal conclusion, Ritchie cites <u>Strickland</u> for the proposition that "[t]he reasonableness of performances is a 'mixed question of law and fact.'" Br. of Appellant at 27. We first observe that <u>Strickland</u> actually declares, "*Ineffectiveness* is not a question of basic, primary, or historical fact. Rather, . . . it is a mixed question of law and fact." <u>Strickland</u>, 466 U.S. at 698 (citations omitted) (emphasis added); <u>see also</u> <u>Coleman</u>, 741 N.E.2d at 699 ("[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.") (citation omitted). In any event, even assuming for argument's sake that Ritchie's basic premise is correct, this contention does not advance his claim. When facts sufficient to demonstrate deficient performance are undisputed, then whether those facts show ineffective assistance becomes a question of law. <u>See, e.g.</u>, <u>Moffitt v. State</u>, 817 N.E.2d 239, 246 (Ind. Ct. App. 2004) (declaring that where facts sufficient to create probable cause are undisputed probable cause is a question of law).

In this case, the facts upon which Ritchie relies are not in dispute. The question is whether those facts demonstrate ineffective assistance of counsel. This is a question of law for the post-conviction court to resolve. We find no abuse.

### Conclusion

We affirm the judgment of the post-conviction court.

Shepard, C.J., and Dickson, Sullivan and Boehm, JJ., concur.