Pursuant to Ind.Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before
any court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the
case.



FILED

Oct 23 2013, 5:44 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**WILLIAM D. POLANSKY**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

EUGENE ROBINSON,                    )
                                    )
    Appellant-Defendant,        )
                                    )
        vs.                )     No. 45A03-1301-PC-21
                                    )
STATE OF INDIANA,                   )
                                    )
    Appellee-Plaintiff.         )

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas P. Stefaniak, Jr., Judge
The Honorable Natalie Bokota, Magistrate
Cause No. 45G04-1112-PC-14

**October 23, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Eugene Robinson appeals the post-conviction court's denial of his petition for post-conviction relief. Robinson raises two issues which we consolidate and restate as whether the court erred in denying his petition for post-conviction relief. We affirm.

FACTS AND PROCEDURAL HISTORY

The relevant facts as discussed in Robinson's direct appeal follow:

In March 2010, the Gary Police Department received information regarding illegal drug activity. Around March 16, 2010, Detective Christopher Stark conducted a controlled buy of narcotics using a confidential informant, Richard Shoback, but Detective Stark was unable to identify the men who sold narcotics to Shoback.

On March 23, 2010, Detective Stark attempted to make another controlled purchase at the same location using Shoback, who was equipped with an audio and video device. Shoback was also given purchase money that had been photocopied. Detective Stark drove Shoback to a point about a block away from the residence where he was to make the controlled purchase. Shoback exited Detective Stark's undercover vehicle and began walking towards the residence.

Right before reaching his destination, Shoback encountered a group of men, including Robinson, who inquired whether Shoback had drugs to purchase. Shoback explained to Robinson that he "wanted to get a 50," meaning that he wanted $50 worth of cocaine. Tr. p. 183. Robinson asked for Shoback's money, but he would not give it to him. Robinson said something to the effect of "we will go and get it." Id. at 184. Robinson again tried to take Shoback's money, but he refused to give it to him because Robinson did not have any drugs to sell. Robinson punched Shoback in the face.

Shoback noticed other people approaching and tried to escape, but Robinson prevented it by holding onto his hooded sweater. Robinson held Shoback until the other people arrived from across the street. At Robinson's trial, Shoback testified, "I am six foot one and a half. I was three houses away from the corner. I would have made it to safety if somebody didn't hold me against my will." Tr. p. 223.

After the other individuals arrived, they attacked Shoback, who immediately fell to the ground. Robinson was still holding onto Shoback as he fell. Robinson started kicking Shoback and stomping on his head. The

2

other men also kicked and stomped on Shoback, who was struck numerous times in the ribs, hips, head, and face.

Detective Sam Abegg was a block away and watching through binoculars when the individuals began to attack Shoback. Detective Abegg and the other officers drove to the scene where he saw Robinson continuing to stomp on Shoback's head. Detective Abegg ordered the men to stop and to lie on the ground. Three men obeyed immediately. A juvenile, C.W., fled the scene, but two officers caught him. Robinson started to walk away, but Detective Abegg ordered him to lie down a second time, and he complied. Detective Starks searched C.W. and found $80, including $40 of the $50 that Detective Starks had given to Shoback as purchase money.

Shoback was taken to the hospital for his injuries. Although he was not unconscious, he was confused, did not know what was happening, and was "staggering around." Tr. p. 99, 187, 432. As the result of the attack, Shoback suffered lacerations to his right eyebrow and to the back of his head, which required six staples. Additionally, Shoback suffered bruising to three of his ribs and to the right side of his face. Shoback indicated to the medical personnel treating him that he was in "severe" pain. Id. at 330.

Robinson v. State, No. 45A03-1010-CR-547, slip op. at 2-4 (Ind. Ct. App. July 19, 2011).

On March 25, 2010, the State charged Robinson with robbery as a class A felony, robbery as a class B felony, criminal confinement as a class B felony, criminal confinement as a class C felony, and battery as a class C felony. Id. at 4. On May 20, 2010, Robinson's trial counsel filed a motion to produce evidence requesting a number of items. Robinson's counsel also served subpoenas on Robinson's four codefendants. On September 2, 2010, an attorney for Darell Love, a person involved in the incident, filed a motion to quash subpoena filed by Robinson's trial counsel and argued that he pled guilty, that there was no agreed sentence, and that Love would be invoking his Fifth Amendment right and privilege.

On September 3, 2010, Robinson's trial counsel filed a motion to confirm prosecutorial misconduct and argued that Robinson's four codefendants accepted plea

3

agreements and that "the prosecutor continued all of the sentencing in a direct attempt to hamper [Robinson] from calling these witnesses to illustrate his innocence in this matter after defense Counsel in open Court advised the Judge that he would seek to call the Co-Defendants and introduce there [sic] plea agreements." Appellant's Direct Appeal Appendix at 42. Also in September 2010, Robinson's trial counsel filed a motion for continuance of trial, release of defendant, and change of jurisdiction. Trial counsel argued in part that "it appears that the prosecution has tried to manipulate justice in this case by continuing all four of the co-defendant cases . . . ." Id. at 47. On September 7, 2010, counsel for Degerie Scott, a codefendant, also filed a motion to quash subpoena which the court granted. The other subpoenas were also quashed.

A three-day jury trial began on September 7, 2010. Robinson's trial counsel argued the evidence did not support confinement. His counsel introduced a police report, a statement from Shoback dated March 23, 2010, a statement by Detective Abegg dated March 23, 2010, and plea agreements and accompanying factual bases for others involved in the incident, all of which did not explicitly mention that Robinson held or confined Shoback. Detective John Suttles testified that he was watching Shoback through binoculars walking down the street and during cross-examination, testified that Shoback was punched in the face and went down.

Shoback testified that he tried to "get away" from Robinson but that Robinson was holding on to his hoodie and "was restraining [him] from running away until the other guys from across the street could get up to [them]." Trial Transcript at 185. Shoback also testified: "[M]y sleeve was pulled on the inside out. And he was still holding on to

4

my jacket as I fell to the ground with my right sleeve out." Id. at 185-186. On cross-examination, Shoback testified that Robinson held him against his will by holding onto his hooded sweatshirt and that he "tried to pull out of it, which in turn makes the sleeve go inside out." Id. at 205. Shoback also testified: "I know that I was held against my will or I would have ran away. Okay. I am six foot one and a half. I was three houses away from the corner. I would have made it to safety if somebody didn't hold me against my will." Id. at 223. During later examination by Robinson's trial counsel, Shoback indicated that he had not mentioned that he had been grabbed by his hoodie until recently.

Detective Abegg testified that was using binoculars and had a clear view all the way down Rhode Island Road where the incident occurred. He also testified that he saw Shoback and Robinson having a physical struggle, that "it appeared to [him] that [Shoback] was trying to get away," that Robinson was holding on to Shoback's clothing, and that the other men completely surrounded Shoback. Id. at 266.

The jury found Robinson guilty on both counts of criminal confinement and battery, but not guilty on the two robbery counts. On September 29, 2010, trial counsel filed a motion to reconsider the judgment on the evidence, to enter a judgment notwithstanding the verdict, or for a new trial. Trial counsel argued that Shoback and Detective Abegg had been coached to present some evidence of restraint to argue a confinement charge, that the State had all of the statements of the codefendants that was contrary to any plan to rob, confine or conspire to do anything and in bad faith proceeded on fictional allegations, and that the only intent presented by the evidence was for Robinson to batter Shoback but not rob or confine him. The trial court denied this

motion on October 12, 2010 and entered judgment of conviction for class B felony criminal confinement and class C felony battery and a "verdict to stand" for class C felony criminal confinement. Robinson, slip op. at 4. The trial court then held a sentencing hearing and sentenced Robinson to a ten-year term for class B felony criminal confinement to be served concurrent with a four-year term for class C felony battery.

On direct appeal, Robinson argued that the evidence was insufficient to sustain his conviction for criminal confinement as a class B felony, and this court affirmed his conviction.

On December 20, 2011, Robinson, *pro se*, filed a petition for post-conviction relief. On June 12, 2012, he filed an amended petition for post-conviction relief. Robinson argued that his trial counsel was ineffective for failing to continue the trial until certain witnesses were available to testify, failing to file a motion to correct error, and failing to investigate two individuals seen in the video recorded by Shoback's wire. Robinson also alleged that there exists evidence of material facts not previously presented that requires vacation of the conviction in the interest of justice.

On September 19 and 27, 2012, the court held an evidentiary hearing. Robinson's trial counsel indicated that he watched the video from Shoback's wire and when asked whether he saw any avenue for further investigation, trial counsel stated: "I mean, looking back on it, I guess I could have explored some things. I don't know." Post-Conviction Transcript at 30. Robinson's post-conviction counsel showed trial counsel the video from Shoback's wire, and trial counsel indicated that he saw two men sitting on a porch at one point in the video and it appeared that the men had an unobstructed view

of what was happening in the street. When asked whether he made "any effort in investigating who those people were and trying to get them to testify," trial counsel stated, "No." Id. at 32. Trial counsel also testified that he immediately filed an appeal for Robinson and that he "felt like [a motion to correct error] was going to be a wasted effort in that courtroom because of what had transpired." Id. at 29. Specifically, the following exchange occurred during the direct examination of trial counsel:

Q.      . . . So did it ever occur to you to obtain affidavits from [the codefendants] and file a motion to correct error to present that testimony that you had not been allowed to present at the trial?

A.      The reason that that wasn't explored was because at Mr. Robinson's sentencing, again, I felt like there was a big problem with this case. When the judge decided to get [sic] his recitation as to why he was sentencing, one of the things he brought up, and it should be in your record, was that he felt that Mr. Robinson was a drug dealer. This case wasn't about drug dealing. He was being found not guilty of that. So that seemed to have been the basis for him sentencing Mr. Robinson more harsh than he did everyone else. Now, another problem I had was that in my arguments both at trial and during sentencing, is that one of those gentlemen had stomped the victim with a pair of boots. Those boots was [sic] covered in blood. Mr. Robinson had, and I think they said very minute, speckles of blood, if any, on him at all. But the guy who was covered in blood was given a probationary sentence, and I couldn't understand and I questioned that with the judge, and the judge went through his recitation at sentencing, why he did what he did and how I couldn't compare sentences to each other. And I can [sic] understand why the reason the guy covered in blood, who clearly split the man's head, was able to walk away with probation. This gentleman was given an extremely large amount of time in prison. So once that was done, I went downstairs, immediately filed an appeal for him. So at that point motion to correct errors, I felt like it was going to be a wasted effort in that courtroom because of what had transpired.

Id. at 26-29. Trial counsel also testified that "[i]n hindsight I don't think it would have done any good with the judge. But for the record's sake, yes, it may have been

something beneficial for you, but for Mr. Robinson, I think the judge's mind was set or made up." Id. at 29.

Terryon Hodge testified that he was one of the individuals sitting on the porch seen in the video recorded by the camera attached to Shoback. Hodge testified that he saw the incident in which Robinson was arrested and described the following:

> I was sitting like next door of the house where he lived, and a man came on the block, and I guess they was talking them two, and then like I guess he punched him, you know what I'm saying? Then a whole bunch of people came and like jumped on him, then police hit the block and everybody kind of like scattered.

Id. at 116. The following exchange occurred during the direct examination of Hodge:

Q.  Did you have a complete unobstructed view of what happened? Did you see everything?

A.  Yeah, I seen a lot.

Q.  Was there anything like a vehicle or shrubbery or a tree that obscured your view of what was happening?

A.  I mean, once the police – all type of vehicles start pulling on the block once the incident happened.

Q.  I mean, taking you back to the very beginning of the incident when Eugene Robinson first encountered the guy, did you see everything?

A.  Yeah.

Q.  Did you see Eugene Robinson punch the man?

A.  Yes.

Q.  Did you see Eugene Robinson hold the man from – keeping him from running away?

A.  No.

8

Q.    Did you see Eugene Robinson grab any article of the man's clothing?

A.    No.

Q.    Is it fair to say that Eugene Robinson punched the man, and the man fell down and then the others ran over and started also attacking the man?

A.    Yes.

Id. at 119-120.   Hodge testified that he never made any attempt to contact the police, that the police never contacted him, that Robinson's trial counsel never contacted him, and that he was staying in Indianapolis in September of 2010.   The following exchange then occurred between Hodge and Robinson's post-conviction counsel:

Q.    [I]f you had been subpoenaed for a trial here in Crown Point, would you have been able to attend as a defense witness?

A.    No.

Q.    Yes?

A.    Yes.

Id. at 125.

Schevon Bonner testified that Robinson was the father of her children, that the people in the image from the video were her neighbors, and that one of the men was Terryon Hodge.

Love testified that he was one of Robinson's codefendants, was with Robinson on the day of the incident, and that no one grabbed Shoback or prevented him from running away but that he did not see certain events.   Degerie Scott testified that he was one of Robinson's codefendants and that he could not tell who struck who first but that he saw

9

the entire encounter and that he did not see Robinson hold Shoback to keep him from running away.

At the end of the hearing, Robinson's post-conviction counsel asked the court whether it was interested in a citation to authority, and the court stated: "I would expect that to be within your proposed findings of fact and conclusions of law. In fact, I count on that in the conclusions of law, absolutely, sir." Id. at 137. Robinson's proposed findings of fact and conclusions of law focused on trial counsel's failure to investigate Hodge and stated: "Due to the Court's resolution of the failure to investigate claim, it need not rule on petitioner's other claim involving ineffective assistance of trial counsel for failing to secure testimony from Love, Scott, and Berry, or the status of that evidence as newly available." Appellant's Appendix at 41.

On January 3, 2013, the court denied Robinson's petition for post-conviction relief. The court's order states in part:

**Findings of Fact**

\* \* \* \* \*

2. On March 26, 2010, the Lake County Public Defender's Office was appointed to represent Robinson. The court ordered the parties to exchange discovery. Included in the State's discovery was a recording made of the beating from Shoback's perspective. Shoback was working as a confidential informant for the Gary Police Department on March 23, 2010. Therefore, he was fitted with a recording wire to memorialize the anticipated purchase of drugs he would make at the target location. Among the images caught on the wire tape was a nearby house with two people sitting on the porch.

\* \* \* \* \*

7. Robinson returns to this court with a petition for post-conviction relief that alleges trial counsel ineffective. Specifically, Robinson

10

claims that his attorney performed deficiently by failing to investigate the identity of the individuals seated on the porch near the site of the crime who would have witnessed the events occur. Robinson argues that he was prejudiced by counsel's deficient performance because if counsel had presented the testimony of one of these witnesses, Terryon Hodge, the outcome of the trial could have been different.[1]

\* \* \* \* \*

9. At the time that trial counsel represented Robinson, he had been an attorney for twenty years. He had tried hundreds of cases. In Robinson's case, he did not depose Richard Shoback or Detective Abegg. He reviewed the discovery. In PE9, the two men on the porch can be seen at time stamp 12:33:10. He did not investigate the identity of these men.

10. Robinson is the father of Schevon Bonner's children. She examined a still shot of the porch from PE 9. She was able to identify one of the men as "Crazy Legs." She could not name the second man. Unfortunately, as she tried to remember the man's name someone from the audience of the courtroom called out "Terryon Hodge."[2]

11. Terryon Hodge testified that he was the second man sitting on the porch of the neighboring house on March 23, 2010. He had an unobstructed view of Robinson and Shoback during their encounter. He was positioned approximately forty feet from them as they stood in the street. He did not see Robinson holding Shoback but did see Robinson punch Shoback. He left when the police arrived. He relocated to Indianapolis, Indiana some time thereafter.

---

[1] In the amended petition, Robinson raised an additional allegation of ineffectiveness: that counsel failed to continue the jury trial until such time as certain witnesses were available to testify, or to file a motion to correct error pursuant to Ind. Tr. Rule 59(a)(1); alternatively, that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction in the interest of justice. Robinson has crafted his proposed findings of fact and conclusions of law to grant relief on the failure to investigate issue. Therefore, he does not present argument, citation or legal support for the issue of counsel's failure to continue the trial. We deem this claim waived and therefore, decline to address it herein. *See, eg,* App. R. 46(A)(8) for analogous treatment of issues raised on direct appeal.

[2] Robinson argues that Bonner had no problem naming Hodge, that the only trouble she had at all was in remembering the last name of Crazy Legs, and the incident of someone in the audience calling out a name occurred when Bonner was being asked about Crazy Legs. The State concedes that Robinson is correct and that Bonner knew Hodge's name but not Crazy Legs's full name.

12. Immediately after the attack on Shoback, eight police officers searched the street and surrounding area of the beating looking for evidence. Tr. p. 154.

*Conclusions of Law*

\* \* \* \* \*

5. . . . . The image of Hodge and "Crazy Legs" is a fleeting image swimming in the pool of evidence counsel reviewed. The testimony of trial counsel at the PC hearing established only that he did not conduct any investigation into who these people were. There is no evidence of why he did not investigate their identities or potential usefulness as witnesses. We do not know whether he failed to notice these men in his review of the video or whether he saw them but recognized no evidentiary value to their presence or whether he made a conscious decision to not pursue their potential testimony. There is simply no evidence that the failure to investigate was not tactical, strategic or deliberate. We conclude that Robinson has failed to prove counsel performed deficiently.

6. Even if counsel's failure to investigate these potential witnesses were [sic] deemed constitutionally deficient performance, Robinson has failed to prove that he was prejudiced by counsel's inaction for a number of reasons. First, there is no evidence that any individual listed in the State's discovery materials would have been able to identify the individuals for trial counsel. The only witness presented at the PC hearing to show that an investigation by trial counsel would have yielded a name was Ms. Bonner and she did not know Terryon Hodge's name. Second, assuming for the sake of argument, that trial counsel could have discovered Hodge's identity, we are not persuaded that Hodge would have cooperated in offering testimony. Although he testified at the post-conviction hearing that he would have spoken to an attorney if contacted, we note that multiple police officers were present at the scene immediately following the shooting and Hodge went indoors and never contacted the police, on-scene or off, to say he was a witness to the event. After the beating, he relocated to Indianapolis. Finally, even if Hodge could have been identified and did in fact testify at trial consistently with his testimony at the PC hearing, it is unlikely his testimony would have effected an acquittal. At trial, Shoback described the holding by Robinson as occurring while Robinson put his hand on Shoback's shoulder. We are struck by the seeming innocence of this gesture and are not persuaded that Hodge would have noticed or

12

remembered this touching. In other words, the fact that Hodge did not perceive Robinson to be holding onto Shoback would not have persuaded a jury that Shoback and Abegg were not credible witnesses of the confinement.

Id. at 50-56.

## DISCUSSION

Before discussing Robinson's allegations of error, we note the general standard under which we review a post-conviction court's denial of a petition for post-conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. Fisher v. State, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner typically stands in the position of one appealing from a negative judgment. Fisher, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. Id. Further, the post-conviction court in this case entered findings of fact and conclusions thereon in accordance with Indiana Post-Conviction Rule 1(6) with respect to some of Robinson's claims. Id. "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." Id. In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. Id. The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. Id.

Robinson argues that his trial counsel was ineffective for failing to investigate the men sitting on the porch in the video and failing to present the testimony of Hodge.

13

Robinson contends that the court erred in finding that his claim of ineffective assistance for failing to file a motion to correct error was waived and that this court should address this claim. He also argues that the testimony of Love and Scott "could be viewed by this Court as newly-discovered evidence, under the Indiana nine-part test . . . ." Appellant's Brief at 27.

Generally, to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. Ben-Yisrayl v. State, 729 N.E.2d 102, 106 (Ind. 2000) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), reh'g denied), reh'g denied, cert. denied, 534 U.S. 830, 122 S. Ct. 73 (2001). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. French v. State, 778 N.E.2d 816, 824 (Ind. 2002). To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Perez v. State, 748 N.E.2d 853, 854 (Ind. 2001). "[L]ogic dictates that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" Hilliard v. State, 609 N.E.2d 1167, 1169-1170 (Ind. Ct. App. 1993) (quoting Strickland, 466 U.S. at 696, 104 S. Ct. at 2069)). Failure to satisfy either prong will cause the claim to fail. French, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. Id.

When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Morgan v. State, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." Williams v. State, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. Clark v. State, 668 N.E.2d 1206, 1211 (Ind. 1996), reh'g denied, cert. denied, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." Burr v. State, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." Whitener v. State, 696 N.E.2d 40, 42 (Ind. 1998).

A.    Failure to Investigate

Robinson argues that his trial counsel was ineffective for failing to investigate and present the testimony of Hodge. Robinson argues that the evidence of confinement was solely the testimony of Shoback and Abegg and that "that evidence was undermined by the evidence that neither of them had said anything in their various contemporaneous statements and reports about Robinson restraining Shoback, so this charge would have been a close call for the jury." Appellant's Brief at 21. Robinson contends that "[a]dding Hodge's testimony to the evidence would have refuted the testimony of Shoback and Abegg, and would have corroborated the impeachment of their testimony that came from

15

the complete lack of mention in their contemporaneous reports as to any holding of Shoback's clothing."[3] Id. Robinson states that the court's conclusion that Hodge would not have cooperated in offering testimony is "belied by the plain fact that Hodge testified at the post-conviction evidentiary hearing, and testified that he would have been available to testify at the time of the trial, in September 2010." Id. at 17. Robinson contends that "[i]t is common sense that the reasons a person might be disciplined to volunteer to help the police have no correlation to whether the same person would be willing to assist a defense attorney." Id. at 19.

The State argues that trial counsel's performance was not deficient and that counsel mounted a vigorous defense, introduced the guilty pleas and stipulated factual bases of the codefendants, the statements of Detective Abegg and Shoback, and elicited testimony that none of the documents showed any evidence of confinement. The State points out that trial counsel caused Shoback to admit that he had not mentioned that Robinson grabbed and held him until trial. The State also points to trial counsel's closing argument in which he pointed out that Shoback had not mentioned that Robinson had held him until recently and that "[t]here's no confinement in this case, don't be misled." Trial Transcript at 608. The State maintains that Robinson has not demonstrated prejudice because it was unclear whether Hodge would have testified at trial and that it

_____

[3] Robinson also argues that the court's conclusion that "it is unlikely [Hodge's] testimony would have effected an acquittal," is an error of law because it overstates the Strickland test for prejudice. Appellant's Brief at 19. The State argues that the court was "not setting forth the standard – the requirement that the result of the proceeding would have been different – but was stating what that different outcome would be: an acquittal," and that the court's statement of "what that 'different result' would be was not error." Appellee's Brief at 22. As previously noted, to meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, French, 778 N.E.2d at 824, and that a reasonable probability is a probability sufficient to undermine confidence in the outcome. Perez, 748 N.E.2d at 854.

was unlikely that Hodge's testimony would have changed the outcome. The State also points out that Hodge was obscured by a tree in the video.

With the benefit of hindsight, a defendant can always point to some rock left unturned to argue counsel should have investigated further. Ritchie v. State, 875 N.E.2d 706, 719 (Ind. 2007), reh'g denied. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that it deprived the defendant of a fair trial. Id. (citing Strickland, 466 U.S. at 686, 104 S. Ct. 2052). Generally, "[c]ounsel's failure to interview or depose State's witnesses does not, standing alone, show deficient performance."[4] Williams, 771 N.E.2d at 74. "The question is what additional information may have been gained from further investigation and how the absence of that information prejudiced his case." Id.

We have reviewed the video in question and cannot say that the post-conviction court's characterization of the two individuals sitting on the porch as fleeting was clearly erroneous. While Robinson's post-conviction counsel showed trial counsel a picture from the video with a time stamp of 12:33:10 and trial counsel indicated that there were two men sitting on a porch and it appeared they had an unobstructed view of what was happening in the street, the physical altercation does not occur until 12:33:18 in the video and at that time a large tree appears in the video in front of where Hodge was sitting. Further, the video indicates that Robinson was standing between the location where Hodge was sitting and Shoback. Under the circumstances, including the testimony of

_____

[4] Robinson does not allege that Hodge was on the State's witness list.

17

Shoback and Detective Abegg and the relative location of the individuals involved, we cannot say that the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court.[5]

B.       Failure to File Motion to Correct Error

Robinson argues that the post-conviction court erred in finding that some of his claims were waived because he failed to present argument and citation or legal support for trial counsel's failure to continue the trial.  Robinson argues that "although this Court could remand for the court below to rule on this claim, the record is complete, and therefore in the interest of judicial economy, this Court could decide the issue." Appellant's Brief at 26 (citation omitted).  He asserts that "[i]f this Court elects to address this issue on the merits, it can easily conclude that [trial counsel] performed deficiently by not using a Motion to Correct Error to put the testimony of the codefendants before the trial judge."[6]  Id.  Robinson contends that while trial counsel indicated at the post-conviction hearing that filing a motion to correct error would not have been meritorious, "[n]ot filing a motion to preserve an issue for appeal because of a prejudgment that it will be denied is a disservice to the client, is an affront to the trial judge, and is outside the

---

[5] Robinson points to the post-conviction court's statement that "[b]ased on the fact that it is the State's burden to investigate and prove its case, we cannot say that counsel's failure to conduct an independent investigation fell below prevailing professional norms."  Appellant's Appendix at 54-55. Robinson argues that this contravenes Strickland which states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  466 U.S. at 691, 104 S. Ct. at 2066.  We agree that the post-conviction court's statement was erroneous. However, we also note that the post-conviction court also stated that an attorney's performance is satisfactory only if he makes a reasonable investigation of the principal facts of the defendant's case or makes a reasonable decision that particular investigations are unnecessary.  Appellant's Appendix at 55. We cannot say that reversal is required on this basis.

[6] Robinson does not argue that his trial counsel was ineffective for failing to request a delay of the trial and focuses on whether his trial counsel was ineffective for failing to file a motion to correct error.

18

wide range of reasonably competent professional assistance." Id. at 27. He argues that the testimony of Love and Scott "could be viewed by this Court as newly-discovered evidence, under the Indiana nine-part test . . . ." Id.

The State argues that "[l]acking evidence and argument on this claim, the post-conviction court properly found it to be waived." Appellee's Brief at 24-25. The State argues that even if Robinson did not waive his alternative argument, trial counsel did not provide ineffective assistance when he declined to seek to delay trial or file a motion to correct error because trial counsel had the opinion that the court's mind was already set. The State maintains that Robinson has failed to demonstrate that the outcome would have been any different had trial counsel filed a motion to correct error. The State also argues that Love "gave conflicting testimony, alternatively asserting that he was on the phone so that he did not see everything that happened, but then asserting that if [Robinson] had held Shoback, he would have seen it, before finally admitting to the post-conviction court that he could not see what everyone else was doing." Id. at 26. The State asserts that from Scott's testimony, "it is evident that at best [Robinson] could have called one additional witness who could have testified that he did not see [Robinson] restrain Shoback." Id. at 27.

Even assuming that Robinson did not waive this issue, we cannot say that reversal is warranted. Generally, new evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7)

19

the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial. Carter v. State, 738 N.E.2d 665, 671 (Ind. 2000) (citing Fox v. State, 568 N.E.2d 1006, 1007 (Ind. 1991)). We analyze these nine factors "with care, as '[t]he basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized.'" Id. (quoting Reed v. State, 508 N.E.2d 4, 6 (Ind. 1987)). Generally, the defendant bears the burden of showing that the newly discovered evidence meets the standard for a new trial. Bradford v. State, 675 N.E.2d 296, 302 (Ind. 1996), reh'g denied.

While Love testified that no one grabbed Shoback or prevented him from running away, Love's testimony was difficult to follow, involved conflicting statements, and the court clarified that Love did not see what each of the other attackers was doing while Love was striking Shoback. Love initially indicated that he could not recall who went over to Shoback first and then stated: "I think – if I'm not mistaken, I think [Robinson]." Post-Conviction Transcript at 46. During the direct examination of Love, the following exchange occurred:

Q. Did you see [Robinson] strike or hit or punch Mr. Shoback?

A. No, I don't think he was – no, he wasn't the first, no. He wasn't the first, no. No, he wasn't the first person to hit him. I seen him, but he wasn't the first person.

Q. Who was the first person to hit Mr. Shoback?

A. I have no idea. I think I came in like second or third.

Q. Did you see the entire encounter between Shoback and anyone who was on the street?

20

A.     No, I had my – I had my back turned.  I had my back turned to everything, when I was on the phone.  When I was on the phone, I had my back turned to everything.

Q.     Did you ever see Mr. Eugene Robinson hold Shoback or grab him or grab his hoodie?

A.     No, nobody hold him or grab him or anything.

Q.     I'm sorry, could you repeat that?

A.     Did no one hold him or grab him or anything.

Q.     Okay.  Well, he testified at his trial that Mr. Robinson held him and prevented him from escaping.  Is that true?

A.     No.

Q.     All right.  So, I mean, is it possible that something happened that you didn't see?

A.     No, I seen – I mean, I seen that part.  I was there during the whole, you know what I'm saying, fighting and everything.  I seen that part.  I didn't see no one holding him or anything.  I didn't see no one holding him.

Id. at 47-48.  On cross-examination, the following exchange occurred:

Q.     Mr. Love, I'm trying to get a handle on your testimony.  You said your back was turned to everything but you saw the whole fight.

A.     He said when he was walking up on the block, did I see which way he was coming?  Did I see which way he was coming and who the first person he talked to.

Id. at 49.  On redirect examination, the following exchange occurred:

Q.     Referring back, Mr. Love, to your stipulated factual basis, paragraph five says that Robinson took the buy money Shoback had by grabbing it out of his hand; Robinson did not have any crack cocaine to sell.  Is that true?  Are those statements true?

A.    No, I didn't see – no, I didn't see all that and everything. I don't think he couldn't have had the money because they found that on somebody else.

Q.    Now, this is before the beating?

A.    No, I didn't see nothing.

Id. at 54-55. Love also testified:

[T]he man was walking up the street asking for some drugs, you know. [Robinson] was walking up to him, just walking with him back this way. (Indicating.) The man got struck by – I don't remember who it was, then that's when I came in. He was falling to the ground. That's when I came in. I got on top of him and got to hitting him. Now, whoever else hit him before, I mean, hit him after that and everything, I don't know because I was on top of him.

Id. at 55-56. Later, the court questioned Love as follows:

Q.    Mr. Love, sir, I just want to clarify something for myself. When you started your testimony, you said that you saw the whole fight so you were able to see that Mr. Robinson did not grab Mr. Shoback, correct?

A.    Yes.

Q.    Okay. Later you then said that once one or two – once Mr. Shoback was hit once or twice, you then jumped on top of him and were hitting him.

A.    Yes.

Q.    So you couldn't see what everybody else was doing; is that right?

A.    Right.

Id. at 74-75.

    Scott testified that he was one of Robinson's codefendants and that he could not tell who struck who first but that he saw the entire encounter and that he did not see Robinson hold Shoback to keep him from running away.

22

Given the conflicts in this testimony, we cannot say that Robinson has demonstrated that there is a probability sufficient to undermine confidence in the outcome that, but for counsel's unprofessional errors, the result of the proceeding would have been different, or that the evidence will probably produce a different result at retrial.

For the foregoing reasons, we affirm the post-conviction court's denial of Robinson's petition for post-conviction relief.

Affirmed.

RILEY, J., and BRADFORD, J., concur.