# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 30 2019, 8:24 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lauren A. Jacobsen
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christian A. Stewart, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 30, 2019 <br><br> Court of Appeals Case No. 19A-CR-411 <br><br> Appeal from the Ripley Circuit Court <br><br> The Honorable Ryan J. King, Judge <br><br> The Honorable Jeffrey L. Sharp, Special Judge <br><br> Trial Court Cause No. 69C01-1705-F2-6 |

**Altice, Judge.**

[1] Following a jury trial, Christian Stewart was found guilty of Level 2 felony conspiracy to commit burglary and Level 4 felony unlawful possession of a firearm by a serious violent felon. He raises the following two restated issues on appeal:

> I. Did the State present sufficient evidence to support Stewart's conspiracy to commit burglary conviction?

> II. Is his sentence inappropriate in light of the offenses and the character of the offender?

[2] We affirm.

## Facts & Procedural History

[3] On the morning of May 16, 2017, homeowner David Wood, along with his employees Roger Marquardt and Ed Robinson, were working in Wood's tractor and mower repair shop, which was located in Wood's garage on his rural property in Ripley County, Indiana. Around 10:30 a.m., a man, later determined to be Stewart, approached from the woods, not the driveway, and came in the door "out of breath . . . and [] just kind of acting funny." *Transcript Vol. 3* at 79. Stewart was carrying his shirt, balled up and tucked under his arm. Stewart said he did not know where he was, and he asked for a ride or to use a phone. Wood gave Stewart a phone to use, and they could hear him yelling on the call. Afterward, Stewart said that his girlfriend and brother were going to pick him up near a farmhouse, and, in the course of that conversation, Stewart mentioned that they would be driving a small red Chevy pick-up truck.

[4] Stewart started walking down the lane, which Wood shared with adjoining landowner, Don Baumgartner. Wood asked Robinson to use his all-terrain four-wheeler (ATV) and give Stewart ride. Robinson did so, and when they reached a bridge, Stewart directed Robinson to turn down a lane, telling Robinson, "we was right back that road there[.]" *Id.* at 118. Robinson turned on the lane, which served as a driveway to Baumgartner's property, and he noticed that Baumgartner's usually-closed gate was bent and laying on the ground. Wood, watching from his driveway, saw Robinson and Stewart turn on Baumgartner's driveway, which he knew was usually gated and locked. Wood and Marquardt got on another ATV and drove to investigate what was happening. When they reached the driveway, Wood saw that the gate was off its hinges and knocked off to the side.

[5] Meanwhile, Robinson was driving Stewart around the property – through a creek, fields, and woods – looking for what Stewart said was a red Chevy S10 pick-up truck. Eventually they returned to the driveway, where they met up with Woods and Marquardt. The men turned off the loud ATV engines, but heard the sound of another engine coming from the direction of the creek. Stewart's demeanor changed – he got "real nervous" – and, without any investigation as to what the sound was, Stewart immediately said "[t]hat's not them" and "they are not over there," referring to his girlfriend and brother in the truck. *Id*. at 74, 88, 116. Wood, Robinson, and Marquardt walked to the sound and discovered that the running engine was Baumgartner's tractor, tipped over on its side in the creek against a tree, with tires spinning and a bush

hog attached. The tractor had a piece of rope, later identified by Baumgartner as having been taken from his barn, tied to the back of it. Robinson checked Baumgartner's hunting cabin and saw that it had been broken into and was "in shambles." *Id*. at 121.

[6] Wood drove home on an ATV to call the Ripley County Sheriff's Department (RCSD). Marquardt stood near the broken gate and Robinson stayed near the tractor with Stewart, but then Stewart walked away toward Marquardt, approaching him aggressively. The shirt that had been balled up under his arm was now wrapped around his hand. Marquardt yelled at Stewart to stay back but Stewart bumped his chest into Marquardt twice. The two yelled at each other and, at some point, Marquardt pushed Stewart away and told him to sit down, which he did, placing his shirt on the ground and exposing part of a handgun. Marquardt kicked away the gun, which landed at Robinson's feet as he was approaching. Robinson picked it up and, after checking and finding that it was loaded, he cleared the chamber and put it in a lock box on his ATV.

[7] Around this time, Wood returned and informed them that he had called the authorities. Stewart remarked that he could not be there when the police arrived and said, "I can't get into trouble." *Id.* at 100. Stewart also picked up a rock, hit himself in the head with it, and said "I'm stupid." *Id.* at 97. A few minutes later, Stewart stood up and tried to walk by Marquardt, who held out his arms to stop Stewart from passing. Stewart was angry and threatened, "I can make one phone call and . . . can have the Arian Nation Brotherhood down here, within just a little bit." *Id.* at 100-01. Stewart calmed and sat down, and

various other neighbors arrived, including Baumgartner. Shortly thereafter, around 11:30 a.m., RCSD Lieutenant Randy Holt arrived at the scene.

[8] Stewart told Lieutenant Holt that he and his pregnant girlfriend, who he identified as Chelsea Baxter, and his cousin had been traveling in his girlfriend's aunt's red Ford Explorer, got lost, then stuck, and he walked for help. Lieutenant Holt secured Stewart's 9mm Glock handgun from Robinson and called for back-up. Stewart was transported from the scene. Lieutenant Holt then examined the tractor and Baumgartner's cabin, where he observed that the door was kicked in, the lock was broken, paneling was torn off the walls, a mattress was flipped over, and a back window had been broken out. He also noted that the bench seats of a nearby wooden picnic table had been removed, and they were scattered around an area that appeared to have vehicle ruts in the mud.

[9] As Lieutenant Holt and another deputy were examining the scene, Wood and Marquardt returned to Wood's home, and Wood spoke with Mrs. Monk, a neighbor, who was trying to determine if one of the other individuals that police were looking for was female because a woman named Kelsey Luellen, who was later identified as Stewart's girlfriend, had knocked on the Monks' door and asked for help. Luellen said that her aunt's dog had jumped out of the back of her truck as she was driving and that, while searching for the dog, she had gotten her truck stuck in some mud. Mr. Monk initially agreed to help, but after being notified of what was happening at Baumgartner's property, he did not pull the truck from the mud and, instead, waited for police to arrive.

[10] Lieutenant Holt and another deputy arrived and spoke to Luellen, who identified herself as Stewart's girlfriend and said she was looking for a lost dog and got stuck. Lieutenant Holt noticed that the red Chevy S10 pick-up had a portion of rope tied to its back bumper, which Baumgartner identified as being the other portion of the rope that someone had taken from his barn and tied to the tractor. The pick-up truck was towed to the RCSD headquarters where officers conducted a search pursuant to a warrant. In addition to the rope, police found other items taken from Baumgartner's property including a machete, a toilet seat, and an axe. Officers also found in the truck Stewart's wallet and identification card, a handwritten letter to Stewart, Luellen's wallet and driver's license, a Glock handgun case with a serial number that matched the serial number of the gun that Stewart had been carrying, and items considered by police to be "burglary tool[s]," including two sets of gloves, two bandanas, a ski mask, and flashlights. *Transcript Vol. 4* at 59, 64, 70. The license plate on the truck was registered to Stacie and Kayla Luellen.

[11] Before Luellen was transported to jail, officers were called to a third scene, which was within a mile of the other two locations. Ron Perry, who was taking care of a farmhouse belonging to his brother-in-law, Martin Bruegge, contacted police because there was a noise coming from inside the house and a few windows had been broken out. Responding officers heard commotion inside the house, "like somebody was throwing stuff around inside" and then saw a male looking out an upstairs window. *Transcript Vol. 3* at 236. Officers yelled for the man, later determined to be Stewart's younger brother, Cameron

Stewart, to come outside. Cameron remained in the house in a standoff with officers for about forty-five minutes. Indiana State Police officers had arrived and were sending in a K-9 when Cameron exited through a side window and ran. The K-9 caught and detained him. While attempting to flee, Cameron threw an object that was later identified as a loaded .45 caliber semi-automatic handgun. Officers entered the Bruegge house and discovered that every room had been "completely ransacked" and a safe had been moved to the middle of the kitchen floor. *Transcript Vol. 4* at 13.

[12] On May 22, 2017, the State charged Stewart with Count, Level 2 felony conspiracy to commit armed burglary; Count II, Level 4 felony serious violent felon in possession of a firearm; Count III, Level 5 felony burglary; Count IV, Level 5 felony burglary; Count V, Class A misdemeanor theft; Count VI, Level 6 felony theft; and Count VII, Class A misdemeanor possession of a handgun without a permit. The State later amended Counts I and II and dismissed the remaining counts.

[13] While awaiting trial in the Ripley County Jail, Stewart wrote four emails to Luellen, who was also in jail.[1] Stewart told Luellen: "I feel guilty about us getting wrapped up in this bull sh*t"; "none of this sh*t would have happened if I wouldn't have dragged you in my life"; "I love you Kelsey Cheyenne Stewart"; and "I'm sorry for everything. I feel like I put you through this shit

---

[1] Because security policy prohibits offenders from directly contacting codefendants, Stewart sent the emails indirectly to Luellen by sending the emails to Stacey Luellen.

and I regret it." *Id.* at 89-90. He also told her "I hate seeing you in this position because it's not where you belong." *Id*. at 90.

[14] At the three-day December 2018 jury trial, the State presented testimony from Wood, Robinson, and Marquardt, as well as various law enforcement officers, and the property owners, Baumgartner, Monk, and Bruegge. The defense rested without presenting evidence. The jury found Stewart guilty of conspiracy to commit armed burglary, and he thereafter pled guilty to unlawful possession of a firearm by a serious violent felon. At the sentencing hearing, the trial court identified several aggravators and found that Stewart's guilty plea to Count II was a mitigator factor, although it was "significantly diminished" by the fact that he pled guilty after the jury found him guilty of possession of a firearm. *Appellant's Appendix Vol. 3* at 52. The trial court sentenced Stewart, then age twenty-three, to thirty years for his Level 2 felony conviction and to a consecutive 12-year term for his Level 4 felony conviction, resulting in an aggregate sentence of forty-two years. The sentencing order directed that "[b]ased on the numerous violations of the rules at the Ripley County Jail and repeated physical altercations with other inmates, the Court finds that the Defendant poses a serious security risk while incarcerated" and recommended that the Indiana Department of Correction "place [Stewart] in a maximum level security facility." *Id.* at 54. Stewart now appeals.

# Discussion & Decision

## I. Conspiracy to Commit Burglary

[15] Stewart claims that the evidence was insufficient to support his conviction for conspiracy to commit burglary. Our standard of review for sufficiency claims is well settled. *Dickenson v. State*, 835 N.E.2d 542, 551 (Ind. Ct. App. 2005), *trans. denied*. We do not reweigh the evidence or assess the credibility of witnesses. *Id*. We look to the evidence and the reasonable inferences to be drawn therefrom that support the verdict. *Id*. We will affirm the convictions if there is sufficient probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id*. at 552. "A judgment may be sustained based on circumstantial evidence alone if that circumstantial evidence supports a reasonable inference of guilt." *Davis v. State*, 791 N.E.2d 266, 270 (Ind. Ct. App. 2003) (citing *Maul v. State*, 731 N.E.2d 438, 439 (Ind. 2000)), *trans. denied*.

[16] To convict Stewart of conspiracy to commit burglary as charged, the State was required to prove that (1) Stewart agreed with Cameron and/or Luellen to commit armed burglary and (2) that one of them performed an overt act in furtherance of the agreement, namely breaking and entering the building or structure of Bruegge or Baumgartner with the intent to commit theft while armed with a handgun. *See* Ind. Code § 35-41-5-2. The State is not required to establish the existence of a formal express agreement to prove a conspiracy. *Dickenson*, 835 N.E.2d at 552. It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to

commit the offense. *Weida v. State*, 778 N.E.2d 843, 847 (Ind. Ct. App. 2002). "'The agreement as well as the requisite guilty knowledge and intent may be inferred from circumstantial evidence alone, including overt acts of the parties in pursuance of the criminal act.'" *Erkins v. State*, 13 N.E.3d 400, 407 (Ind. 2014) (quoting *Survance v. State*, 465 N.E.2d 1076, 1080 (Ind. 1984)).

[17] On appeal, Stewart asserts that "the record does not support an inference that Stewart [] broke and entered any building or structure, or agreed with anyone else to do the same[.]" *Appellant's Brief* at 13-14. Noting a lack of direct evidence – i.e., "No one saw Stewart enter the cabin, barn, or the Bruegge property" – he claims that he was improperly convicted because of his "proximity to [the] location of [the Baumgartner] burglary and his sibling relationship to the criminal responsible for [the Bruegge] burglar[y]." *Id.* at 12, 17. We are unpersuaded, however, and find that the State presented sufficient evidence for the jury to convict Stewart of conspiracy to commit burglary.

[18] Stewart, Luellen, and Cameron traveled together on May 16, 2017, to a wooded area of Ripley County in Luellen's pick-up truck, and they brought with them burglary tools such as gloves, a ski mask, a screwdriver, and two flashlights. They also had two loaded handguns. The exact order of events is not entirely clear, but what is known is that Baumgartner's gate to his driveway was knocked down and his cabin and barn were broken into and property taken. Stewart left Baumgartner's property and walked to Wood's garage, hiding a gun in his shirt that was tucked under his arm, and he asked for a phone or for a ride. After making a call, he said he was going to meet his

girlfriend and brother in a pick-up truck. As Robinson was giving him a ride on the ATV, Stewart directed Robinson down a lane that led to Baumgartner's property, telling Robinson, "[W]e was right back that road there[.]" *Transcript Vol. 3* at 118. When Wood and Marquardt met up with Robinson and Stewart on Baumgartner's driveway, they saw ruts in the mud where a vehicle appeared to have been stuck and wooden planks from a picnic table had been used to get it out of the mud. Stewart got very nervous when the men heard an engine running, which they discovered was Baumgartner's tractor tipped over against a tree. Baumgartner testified that he did not put the rope on the tractor (or on the pick-up truck). Stewart tried to walk away before police arrived and then hit himself in the head with a rock saying he was stupid and could not be there when police arrived. When Stewart sat down on the ground, Marquardt saw the Glock handgun and kicked it to Robinson. The gun had a live round in the chamber and a full magazine. Stewart was confrontational and aggressive with Marquardt, who was physically preventing Stewart from leaving until police arrived, and he made threatening remarks that he could call the Arian Nation Brotherhood who would come quickly to his aid. Stewart gave Lieutenant Holt a somewhat different story than he had told Wood and his friends, telling the officer that he was trying to find his pregnant girlfriend named Chelsea Baxter and his cousin – thus giving a false name for his girlfriend and not mentioning his brother – and he said that they were in a Ford Explorer, not a pick-up truck.

[19]   When police later found the pick-up truck (and Luellen) at the Monks' property, Stewart's wallet and ID were in the truck, as well as the gun case to

the gun he had been carrying, thus linking Stewart to the truck. Also found in the pick-up were various items that had been stolen from Baumgartner's cabin and barn. Around the time that Stewart was transported to jail, police responded to the burglary at the Bruegge property. Stewart's brother, Cameron, eventually jumped out a window and fled on foot, tossing a loaded handgun. Items were strewn about inside the house and a safe moved to the kitchen. Stewart contacted Luellen while in jail and made statements indicating that he regretted getting her involved. From the evidence presented, the jury could have inferred that Stewart had an agreement with Luellen and/or Cameron to come to the secluded, wooded area to burglarize homes.

[20] Stewart suggests that when he left Baumgartner's property and went for assistance, "the only rational inference" is that Luellen dislodged the truck and left before he returned, arguing that, even if items found in the truck could "properly [be] associated with Luellen," he "could not be responsible for the items collected by [her]." *Appellant's Brief* at 14-15. Effectively, Stewart appears to be arguing that Luellen took the property while he was walking to Wood's house and he had no connection to it. Even if she did take it then, that does not preclude his conspiracy conviction. It is well-settled that the evidence need not be sufficient to overcome every reasonable hypothesis of innocence. *Craig v. State*, 730 N.E.2d 1262, 1266 (Ind. 2000).

[21] We also reject Stewart's suggestion that Cameron burglarized the Bruegge house several hours after Stewart was arrested and "the intervening three hours completely attenuates [] Stewart's potential involvement" in that burglary.

*Appellant's Brief* at 16. First, there is no evidence as to when Cameron entered the home, only evidence of when he was discovered in the home. Second, even if Cameron broke in after Stewart had been arrested, that does not preclude a jury inference that Stewart was part of the plan to burglarize the home. Indeed, Stewart, Luellen, and Cameron were all arrested within a three-hour time frame. Stewart was deceptive with Lieutenant Holt, saying that he was with his girlfriend (who he said was named Chelsea Baxter) and cousin when they got lost and stuck in a Ford Explorer, which statements indicate an attempt by Stewart to disassociate himself from Luellen, his brother, and the red Chevy S10 pick-up truck. Ultimately, Stewart's arguments are improper requests to reweigh the evidence. The State presented sufficient evidence from which the jury could have inferred that Stewart agreed with Luellen and/or Cameron to commit burglary.

## II. Inappropriate Sentence

[22] Stewart argues that his sentence is inappropriate. We may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find the sentence inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate at the end of the day

turns on "our sense of culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224. Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The burden is on the defendant to persuade us his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[23] When determining whether a sentence is inappropriate as to the nature of the offense, the advisory sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed. *Id.* at 1081. For his Level 2 felony conspiracy to commit burglary while armed with a deadly weapon conviction, Stewart faced a sentencing range from ten years to thirty years, with the advisory being seventeen and one-half years. Ind. Code § 35-50-2-4.5. For his Level 4 felony possession of a firearm by a serious violent felon conviction, Stewart faced a sentencing range from two to twelve years, with the advisory sentence being six years. I.C. § 35-50-2-5.5. The trial court ordered the maximum sentence on each conviction and ordered them to be served consecutively for an aggregate sentence of forty-two years.[2] Stewart argues that

---

[2] We note that the trial court issued a thirteen-page sentencing order that detailed the aggravating and mitigating circumstances that it considered, including those that it rejected and why. It also explained its reasoning for imposing consecutive sentences. The trial court's thoroughness aided our appellate review.

there was no evidence that he caused bodily harm or intended to do so, that the financial harm was not excessive, and that, at most, he "was somehow involved" in rummaging through unoccupied cabins. *Appellant's Brief* at 20. Therefore, he asserts that he was not the worst of the worst offenders and did not deserve a maximum sentence

[24] As this court has recognized, "[t]he nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation." *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). Here, Stewart, along with his girlfriend and brother, came to the remote area prepared to burglarize cabins or residences, and one or more of them did so. Two of the three, Stewart and his brother, each carried a loaded handgun with a bullet in the chamber, ready to fire. Stewart entered Wood's garage and then was riding around with Robinson on the ATV all while holding the Glock wrapped up under his shirt. When Wood left to call law enforcement, Stewart aggressively approached Marquardt with the gun, now in his hand with the wrapped shirt over it. Stewart chest-bumped Marquardt when Marquardt told Stewart that he was not leaving before police arrived. Stewart also made what Marquardt viewed as threatening remarks about being able to quickly summon the Arian Nation Brotherhood for assistance. Although the financial value of the machete, axe, toilet seat, and rope may have been minimal, both the Bruegge farmhouse and the Baumgartner cabin were ransacked, with items pulled out of drawers and cabinets and strewn about. The Baumgartner gate was knocked off its hinges and the cabin door was kicked in. The tractor, with bush hog still

attached and dragging behind it, was left running against a tree in a creek and was damaged in excess of $1000. At the Bruegge property, family heirlooms were broken or destroyed. Stewart's emails to his girlfriend indicate regret at getting her involved, reflecting his integral role in the burglaries. We find that the nature of the offense does not warrant revision of his sentence.

[25] "The character of the offender is found in what we learn of the offender's life and conduct." *Croy*, 953 N.E.2d at 664. When considering the character of the offender, "'one relevant fact is the defendant's criminal history,' and '[t]he significance of criminal history varies based on the gravity, nature, and number of prior offenses in relation to the current offense.'" *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017) (quoting *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied*), *trans. denied*. The trial court may consider not only the defendant's adult criminal history but also his juvenile delinquency record in determining whether his criminal history is significant. *Id.* Stewart urges on appeal that his prior history was for unrelated and relatively minor offenses, he "is still very young," he was exposed to alcohol and drugs as a teenager, and he was "poorly raised by an alcoholic father and a drug addicted mother." *Appellant's Brief* at 20-21.

[26] When he committed the offenses, Stewart was just shy of twenty-two years old, which we disagree qualifies him as one who would be unable to understand consequences of his actions. Stewart has a juvenile history and spent two years at the Indiana Boy's School. He has five misdemeanor convictions and a prior Class B felony conviction for burglary and was on parole when he committed

the current offenses. With regard to Stewart's difficult upbringing, we recognize the uphill struggle he faced, but our courts have continuously held that "evidence of a difficult childhood is entitled to little, if any, mitigating weight." *Bethea v. State*, 983 N.E.2d 1134, 1141 (Ind. 2013); *Ritchie v. State*, 875 N.E.2d 706, 725 (Ind. 2007); *Bryant v. State*, 984 N.E.2d 240, 252 (Ind. Ct. App. 2013), *trans. denied*. Furthermore, Stewart's grandmother's testimony at the sentencing hearing reveals that, while Stewart had a difficult childhood, she was always available to him and his siblings, offered them a place to stay and meals, and provided support, yet Stewart ultimately made poor choices. Also, as the trial court aptly observed, "Stewart has never worked a day in his life, never had . . . a real job." *Transcript Vol. 4* at 183.

[27] Stewart admits that, while in jail awaiting trial and sentencing, he "had been involved in two battery incidents involving other inmates, had been found in possession of contraband and had been disruptive." *Appellant's Brief* at 21. We find the details of Stewart's conduct in jail are particularly troubling and reflect poorly on his character. Jail Administrator Deputy Bob Curl testified at the sentencing hearing and described a number of violent confrontations between Stewart and other inmates. In at least one altercation in which Stewart struck another inmate, Stewart's brother Cameron was also involved by covering the camera. The two were seen "high fiving" in a celebratory fashion on multiple occasions after striking other inmates. *Transcript Vol. 4* at 156. Stewart was also video-recorded making gang signs and using his hand to appear to point a gun. Stewart, Cameron, and another inmate were angry when contraband was

removed from their cell block, cussing at jail officers and kicking a mop bucket, which hit a jail officer. When Deputy Curl responded to the incident, Stewart made lewd and threatening comments to officers. In another instance, Stewart brutally beat another inmate to the point where the other inmate was sent to the emergency room where he received twenty-two stitches and was found to have a broken nose and broken orbital bone. Stewart was seen on video removing a long piece of metal from his bunk and handing it to another inmate; Deputy Curl explained that the metal piece was "a heavy piece of angle iron" removed from the ceiling that "you could hit somebody and probably kill them with [] instantly . . . It is that heavy." *Id*. at 167. In addition to the above, there were other incidents, such that Stewart was "consistently" breaking the rules. *Id*. at 168. The trial court found, and we agree, that his behavior in jail was "horrendous." *Id*. at 183. We do not find anything about Stewart's character that makes his sentence inappropriate.

[28] We reiterate that our task on appeal is not to determine whether another sentence might be more appropriate; rather, the inquiry is whether the imposed sentence is inappropriate. *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied*. Stewart has failed to carry his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

[29] Judgment affirmed.

Kirsch, J. and Vaidik, C.J., concur.