

ATTORNEY FOR APPELLANT

Anthony C. Lawrence
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kayla N. Hudson,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 30, 2019<br><br>Court of Appeals Case No.<br>19A-CR-1088<br><br>Appeal from the Madison Circuit<br>Court<br><br>The Honorable David A. Happe,<br>Judge<br><br>Trial Court Cause No.<br>48C04-1808-F1-1965 |

**Pyle, Judge.**

### Statement of the Case

Kayla N. Hudson ("Hudson") appeals her aggregate forty-year sentence imposed after she pled guilty to Level 1 felony neglect of a dependent causing

death[1] to her daughter and Level 3 felony neglect of a dependent resulting in serious bodily injury[2] to her son. Hudson argues that: (1) the trial court abused its discretion in its determination of aggravating and mitigating circumstances; and (2) her aggregate sentence is inappropriate. Concluding that the trial court did not abuse its discretion and that Hudson's sentence is not inappropriate, we affirm her sentence.

[2] We affirm.

## Issues

1. Whether the trial court abused its discretion when sentencing Hudson.

2. Whether Hudson's sentence is inappropriate.

## Facts

[3] Hudson had two children, including son R.H. ("R.H.") and daughter P.H. ("P.H.") (collectively, "the children"). On the evening July 28, 2018, Hudson went to work and left twenty-three-month-old P.H. and three-year-old R.H. in the care of her boyfriend, Ryan Ramirez ("Ramirez"). Hudson did so even though she knew that Ramirez had physically abused the children on multiple occasions. Ramirez, along with the children, picked up Hudson from work that evening. R.H. had bruising on his body and legs and swollen eyes. Hudson

---

[1] IND. CODE § 35-46-1-4.

[2] *Id.*

went into a Walmart store to buy cover-up cream to mask the bruising and green tea bags to put on R.H.'s eyes to reduce the swelling before a scheduled doctor's appointment for the following day. When they all got home, Ramirez carried P.H. into the house and put her to bed.

[4] The following morning, around 6:15 a.m., Hudson was "worried" about P.H. because she had "not heard any sounds coming from her" during the night. (Tr. Vol. 2 at 11). When Hudson checked on P.H., she noticed that the child was unresponsive, not breathing, and cold to the touch. Hudson did not call for medical help. Instead, Hudson undressed P.H. and placed her in a warm bath, attempting to raise her body temperature. Hudson noticed that P.H. had bruises on her. After the bath failed to yield the desired results, Hudson attempted to do CPR on the child. Hudson still did not call for medical help. Eventually, Hudson put P.H. in a diaper, dressed her, and took her to the emergency room, where they arrived at 6:49 a.m. P.H. had "multiple contusions and abrasions to her face, head, and body," and these injuries were "apparent to everyone" at the hospital. (Tr. Vol. 2 at 13). P.H. was pronounced dead at 7:06 a.m. An autopsy report was later conducted, and it revealed "two deep liver lacerations accompanied by a measured 410 ml of blood in the abdomen as well as fracture of the right occipital skull, subdural staining overlying the left parietal lobe of the brain and very numerous contusions involving the head, trunk and upper and lower extremities." (State's Ex. Vol. at 6). The report also revealed that P.H. had a "[f]aint circumferential contusion encircling [her] anus and involving the perineum[.]" (State's Ex. Vol.

at 6). The autopsy report listed P.H.'s cause of death as "[m]ultiple blunt force injuries with liver lacerations and hemoperitoneum" and the manner of death as "Homicide[.]" (State's Ex. Vol. at 4).

[5] R.H. was also at the hospital with Hudson. The hospital staff examined R.H., who was "covered with a myriad of contusions and abrasions," and then sent him to Riley Hospital. (Tr. Vol. 2 at 12). Further examination revealed that R.H.'s injuries included "multiple contusions, a fracture to the distal right ulnar diaphysis, a buckle fracture to the ninth rib, an old fracture of the right distal radial diaphysis, a healed fracture at the base of the metatarsal." (Tr. Vol. 2 at 12-13). R.H. also had elevated liver enzymes, indicating that his liver had been bruised and was healing. Additionally, R.H. had petechiae in his left eye that was the result of "a lot of force" to his head, a distended stomach, a bald spot on the top of his head that was caused by either his hair being pulled out or malnourishment, light bruising on and above his penis, and cigarette burns on his ankles. (Tr. Vol. 2 at 13).

[6] The State charged Hudson with Level 1 felony neglect of a dependent causing death and Level 3 felony neglect of a dependent resulting in serious bodily injury.[3] Thereafter, during a March 2019 hearing, Hudson pled guilty as

---

[3] The State charged Ramirez with murder and Level 3 felony neglect of a dependent resulting in serious bodily injury, and it also filed a life without parole enhancement. *See* Trial Cause Number 48C04-1808-MR-1964. Ramirez's case is currently pending and is scheduled for trial in 2020.

charged and agreed to an "open plea." (Tr. Vol. 2 at 5). The trial court accepted the guilty pleas and enter judgments of conviction on both counts.

[7] During the sentencing hearing, the State introduced the autopsy report and photographs of R.H.'s injuries. The State also presented testimony from Kailyn Morgan ("Morgan"), who was the mother of P.H.'s brother, and Dannette Fee ("Fee"), who was P.H.'s maternal grandmother. Both witnesses had, at various times, seen P.H. and R.H. with bruises or injuries on their bodies. These witnesses testified that, when they had asked Hudson about injuries to P.H., Hudson would blame R.H. for P.H.'s injuries. For example, P.H. had previously had a broken leg that required a cast, and Hudson blamed R.H. for the injury. They also testified that Hudson would always have an excuse or a change of story about any injuries to the children. Morgan stated that she had been concerned about Hudson's care of the children and the people that Hudson let around the children. Morgan once questioned R.H. about how he had gotten a mark on his arm, and he responded that "mommy" had done it. (Tr. Vol. 2 at 26). Morgan noticed around Christmas that the children's "behaviors were changing" and that they were "acting very strange[ly.]" (Tr. Vol. 2 at 27). Specifically, Morgan noticed that P.H. was "irritated in her diaper area" and that R.H. was "very underweight[,] . . . look[ed] very malnourished[,] [a]nd was hiding his food[.]" (Tr. Vol. 2 at 27). After Morgan asked Hudson about her concerns for the children, Hudson ceased communication with Morgan and refused to let her see the children. When Fee asked Hudson about R.H. having black eyes, Hudson told Fee that R.H. just

had low iron levels. When discussing Hudson's decision to plead guilty, both Fee and Morgan testified that they did not believe that Hudson had any remorse or sense of responsibility for her offenses against her children. Morgan stated that Hudson's guilty plea was merely "part of the lies that have continued since the beginning" and that she was doing it "to avoid more trouble." (Tr. Vol. 2 at 29). Fee stated that Hudson was "a master of deception" and warned the trial court "not to be misled . . . by her ability to deceive people." (Tr. Vol. 2 at 38).

[8] During the hearing, Hudson admitted that she knew that Ramirez had abused her children, that she had not done anything to stop it, and that she had tried to cover it up. She also admitted that she had lied to the police when they were conducting the initial investigation and then again just a month or two before the sentencing hearing. She also testified that she had been in numerous abusive relationships and admitted that she had put "having a man in front of everything else." (Tr. Vol. 2 at 57). Hudson testified and presented testimony from her therapist at the county jail who testified that Hudson had a difficult childhood and had been raised by her grandparents. Hudson, however, acknowledged that her difficult childhood did not change the fact that she knew it was wrong to beat a child to death. Hudson indicated that she was pleading guilty to accept responsibility and so that R.H. could be adopted by his foster family.

[9] When sentencing Hudson, the trial court stated, in part, as follows:

In cases involving serious misconduct like in this case, I think it's a helpful starting point[] to think about why the legislature treats this conduct so severely. And, of course, that's because as a society we recognize that parents have a crucial, fundamental, human obligation to protect and care for their children. They have to be the ones that are obligated to reach out and help when their child cries out for help. It's fundamental to being a parent, it's fundamental to being a human to respond that way. And the harms from not meeting that obligation can be severe, as they were in this case. It states the obvious to say that this [is] a tragic case. . . . It is not at all an overstatement to say that based on the evidence, the testimony, the autopsy photos, probable cause affidavit, that both of these children suffered tremendously. Openly and visibly. And there's no doubt in the Court's mind that [Hudson] had to have been aware that that was going on, had opportunities to intervene and stop it, and did not do that. . . . The Court has no power to undue [sic] the wrong that happened here and the pain that was caused by Mr. Ramirez and Ms. Hudson. The one thing we can do is hold parents accountable for the actions that they engaged in. This kind of conduct can't be dismissed as a lapse of judgment. It was conscious conduct that went on over a long period of time. And it's reasonable to expect that when young child victims have life-altering harms or life-ending harms that the people who participated in that will have some life-changing consequences as a result.

(Tr. Vol. 2 at 68-69, 73-73).

[10]  The trial court found that Hudson's remorse, her guilty plea, and her lack of criminal history to be mitigating circumstances. As for aggravating circumstances, the trial court found the following: P.H.'s "tender age" and vulnerability; the fact that there were "multiple counts with multiple victims[;]" the nature and circumstances of the offenses, including that the crimes were an

"ongoing pattern of conduct over a period of time" where Hudson was aware of her children's injuries but had failed to intervene and protect them. (Tr. Vol. 2 at 71, 72). The trial court imposed a thirty-one (31) year sentence, which was only one year above the advisory sentence, for Hudson's Level 1 felony conviction and an advisory sentence of nine (9) years for her Level 3 felony conviction, and the trial court ordered that the two sentences be served consecutively in the Indiana Department of Correction. Thus, the trial court imposed an aggregate forty (40) year sentence. Hudson now appeals.

# Decision

[11]    Hudson contends that: (1) the trial court abused its discretion when sentencing her; and (2) her sentence is inappropriate. We will review each argument in turn.

## 1. Abuse of Discretion

[12]    Hudson argues that the trial court abused its discretion in its determination of mitigating and aggravating circumstances. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A trial court may abuse its discretion in a number of ways, including: (1) failing to

enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91.

[13] Hudson first contends that the trial court abused its discretion by failing to consider her troubled childhood as a mitigating circumstance. However, a trial court is not obligated to accept a defendant's claim as to what constitutes a mitigating circumstance. *Rascoe v. State*, 736 N.E.2d 246, 249 (Ind. 2000). In fact, a claim that the trial court failed to find a mitigating circumstance requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Anglemyer*, 868 N.E.2d at 493. "Our supreme court has 'consistently held that evidence of a difficult childhood warrants little, if any, mitigating weight.'" *Patterson v. State*, 909 N.E.2d 1058, 1062 (Ind. Ct. App. 2009) (quoting *Ritchie v. State,* 875 N.E.2d 706, 725 (Ind. 2007), *reh'g denied*).

[14] Here, when sentencing Hudson, the trial court acknowledged Hudson's difficult childhood and her attempt to explain "the causes of how [she] got to this point[,]" and it indicated that "it should not be ignored." (Tr. Vol. 2 at 70). However, the trial court stated that Hudson's childhood "d[id]n't eliminate the responsibility" and refused it as a mitigating factor. (Tr. Vol. 2 at 70). We find no abuse of discretion by the trial court. *See, e.g., Patterson*, 909 N.E.2d at 1062

(concluding that there was no abuse of discretion because the defendant's childhood was not a significant mitigating circumstance).

[15] Next, Hudson challenges the trial court's determination that P.H.'s tender age of twenty-three months was an aggravating circumstance. Specifically, she contends that such an aggravator was improper because the age of the victim was an element of her offense.

[16] Generally, where the age of the victim is a material element of the crime, the age of the victim may not be used as an aggravating circumstance. *Kien v. State*, 782 N.E.2d 398, 414 (Ind. Ct. App. 2003) (citing *Stewart v. State*, 531 N.E.2d 1146, 1150 (Ind. 1988)), *reh'g denied*, *trans. denied*. "However, the trial court may properly consider the particularized circumstances of the material elements of the crime" to be an aggravating factor. *Id.* (citing *Stewart*, 531 N.E.2d at 1150). For example, a trial court may properly consider as aggravating the age of the victim when the trial court considers that the victim was of a "tender age." *Id.* (citing *Stewart*, 531 N.E.2d at 1150 and *Buchanan v. State*, 767 N.E.2d 967, 971 (Ind. 2002)). Stated differently, we have held that a trial court may properly consider the victim's age as an aggravating factor where "the youth of the victim is extreme." *Reyes v. State*, 909 N.E.2d 1124, 1128 (Ind. Ct. App. 2009). Our supreme court has explained that "[t]he younger the victim, the more culpable the defendant's conduct." *Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011).

[17] Hudson seems to recognize that her challenge to this aggravating circumstance rings hollow. Indeed, she acknowledges that "in many neglect of a dependent cases, this Court has affirmed the trial court's use of a victim's tender age as an aggravating factor." (Hudson's Br. 15) (citing *Edwards v. State*, 842 N.E.2d 849 (Ind. Ct. App. 2006); *Kile v. State*, 729 N.E.2d 211 (Ind. Ct. App. 2000); *Mallory v. State*, 563 N.E.2d 640 (Ind. Ct. App. 1990), *trans. denied*). She suggests that we should "revisit[]" these "rulings[.]" (Hudson's Br. 15). We reject her suggestion.

[18] Here, when discussing the tender age of P.H. as an aggravating circumstance, the trial court stated:

> The extreme tender age of P.[H.] in particular is an aggravating factor. The elements of this crime could've been proven with a young teenager, but here we had a two (2) year old child, in fact two (2) children with a fairly tender age, but particularly P.[H.], was particularly vulnerable. She wasn't able in any way to reach out for help outside the home. She was more dependent and more vulnerable so the crime is worse when committed against a child like that.

(Tr. Vol. 2 at 72). The trial court also noted that the abuse against P.H. had occurred over an extended period of time, that Hudson was aware of it, but she did nothing about the abuse. Because the trial court found that P.H.'s tender age to be part of the particularized circumstances of this case, we conclude that the trial court did not abuse its discretion by identifying this aggravating circumstance.

[19] Lastly, we reject Hudson's suggestion that the trial court improperly considered the nature and circumstances of the offenses to be an aggravating circumstance. "Generally, the nature and circumstances of a crime is a proper aggravating circumstance." *Gomillia v. State*, 13 N.E.3d 846, 853 (Ind. 2014) (internal quotation marks and citation omitted). Here, the trial court discussed the nature and circumstances of Hudson's offenses, including the extent and obvious nature of the injuries to the children, the ongoing duration of the abuse, and Hudson's lack of action to protect the children. Accordingly, we conclude that the trial court did not abuse its discretion by considering this aggravating circumstance. *See, e.g.*, *id.*

## 2. Inappropriate Sentence

[20] Hudson argues that the aggregate sentence for her Level 1 felony neglect of a dependent causing death and Level 3 felony neglect of a dependent resulting in serious bodily injury is inappropriate. We disagree.

[21] We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). The defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). The principal role of a Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "Appellate Rule 7(B)

analysis is not to determine whether another sentence is more appropriate but rather whether the sentence imposed is inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012) (internal quotation marks and citation omitted), *reh'g denied*.

[22] When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. Here, Hudson entered a guilty plea and was convicted of Level 1 felony neglect of a dependent causing death and Level 3 felony neglect of a dependent resulting in serious bodily injury. A person who commits a Level 1 felony "shall be imprisoned for a fixed term of between twenty (20) and forty (40) years, with the advisory sentence being thirty (30) years." I.C. § 35-50-2-4. A person who commits a Level 3 felony "shall be imprisoned for a fixed term of between three (3) and sixteen (16) years, with the advisory sentence being nine (9) years." I.C. § 35-50-2-5. The trial court imposed consecutive sentences of thirty-one (31) years—only one year above the advisory sentence—for Hudson's Level 1 felony conviction and an advisory sentence of nine (9) years for her Level 3 felony conviction. Thus, the trial court imposed an aggregate forty (40) year sentence, which was below the potential maximum sentence of fifty-six (56) years.

[23] Turning first to the nature of Hudson's two felony neglect of a dependent offenses, we echo the trial court's observation that twenty-three-month-old P.H. and three-year-old R.H. had "suffered tremendously[,]" both "[o]penly and

visibly[,]" for an extended period of time in their short lives. (Tr. Vol. 2 at 69). More specifically, P.H.'s autopsy report revealed that the toddler had "two deep liver lacerations accompanied by a measured 410 ml of blood in the abdomen as well as fracture of the right occipital skull, subdural staining overlying the left parietal lobe of the brain and very numerous contusions involving the head, trunk and upper and lower extremities." (State's Ex. Vol. at 6). The report also revealed that P.H. had a "[f]aint circumferential contusion encircling [her] anus and involving the perineum[.]" (State's Ex. Vol. at 6). R.H.'s injuries included "multiple contusions, a fracture to the distal right ulnar diaphysis, a buckle fracture to the ninth rib, an old fracture of the right distal radial diaphysis, a healed fracture at the base of the metatarsal." (Tr. Vol. 2 at 12-13). R.H. also had elevated liver enzymes, indicating that his liver had been bruised and was healing. Additionally, R.H. had petechiae in his left eye that was the result of "a lot of force" to his head, a distended stomach, a bald spot on the top of his head that was caused by either his hair being pulled out or malnourishment, light bruising on and above his penis, and cigarette burns on his ankles. (Tr. Vol. 2 at 13). Despite the obvious nature of these injuries and Hudson's awareness of them, Hudson did nothing to protect her children. Instead, she tried to cover up the injuries—both physically with cream and tea bags and factually when she made excuses about the origin of the injuries when confronted by other people.

[24] Turning to Hudson's character, we recognize that she has no prior criminal history. Indeed, the trial court considered that as a mitigating circumstance

when imposing the advisory and near-advisory sentences in this case. We note, however, that Hudson's admitted choice to put "having a man in front of" the care of her young and vulnerable children reflects poorly on her character. (Tr. Vol. 2 at 57). Hudson admitted that she knew that her children were being abused, that she did not do anything to stop it, and that she tried to cover it up. She also admitted that she had lied to police, both when they were conducting the initial investigation and then again just a month or two before the sentencing hearing.

[25] Hudson has not persuaded us that her aggregate forty-year sentence for her Level 1 felony neglect of a dependent causing death and Level 3 felony neglect of a dependent resulting in serious bodily injury is inappropriate. Therefore, we affirm the sentence imposed by the trial court.

[26] Affirmed.

Robb, J., and Mathias, J., concur.